*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *TANJA GAVRILOVIC,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 05-38-P-H* |
| | ) | |
| *WORLDWIDE LANGUAGE* | ) | |
| *RESOURCES, INC.,* | ) | |
| | ) | |
| *Defendant* | ) | |

*RECOMMENDED DECISION ON DEFENDANT'S*
*MOTION FOR SUMMARY JUDGMENT*

Defendant Worldwide Language Resources, Inc. ("Worldwide") moves for summary judgment with respect to all thirteen counts of plaintiff Tanja Gavrilovic's amended complaint against it. *See* Defendant's Motion for Summary Judgment, etc. ("Defendant's S/J Motion") (Docket No. 35) at 1-2; *see also generally* Amended Complaint ("Complaint") (Docket No. 30). For the reasons that follow, I recommend that Worldwide's motion for summary judgment be granted in part and denied in part.

### I.  Summary Judgment Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving

party.'"  *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District.  *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See*

*id*.  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id*.  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id*.

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(e).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact."  *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted.") (citations and internal punctuation omitted).

## II.  Factual Context

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56  and viewed in the light most favorable to Gavrilovic as nonmovant, reveal the following relevant to this recommended decision:[1]

---

[1] As noted above, Local Rule 56 requires a party responding to a statement of material facts to admit, deny or qualify the underlying statement.  *See* Loc. R. 56(c)-(d).  As a general rule, the concept of "qualification" presupposes that the underlying statement is accurate but in some manner incomplete, perhaps even misleading, in the absence of additional information.  Accordingly, except to the

(*continued on next page*)

Worldwide is a Massachusetts corporation with a principal place of business at 34 River Street, Rumford, Maine. Defendant's Statement of Material Facts Not in Dispute in Support of Defendant's Motion for Summary Judgment ("Defendant's SMF") (Docket No. 36) ¶ 1; Plaintiff's Opposing Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposing SMF") (Docket No. 46) ¶ 1. It is in the business of supplying foreign-language translators, *i.e.*, linguists, to clients, including the United States military and various military contractors. *Id*. Worldwide deploys these linguists around the world, including in Afghanistan, Uzbekistan and Iraq. *Id*. Larry Costa is the president and founder of Worldwide. *Id*. ¶ 2.

Gavrilovic first entered into a contract with Worldwide on January 22, 2002 to work as a linguist at NATO headquarters in Kosovo. *Id*. ¶ 3. Gavrilovic, who speaks Serbian, was an independent contractor under this contract. *Id*. On June 24, 2002 Gavrilovic signed a second contract with Worldwide to work as a linguist in Kosovo. *Id*. ¶ 4. Pursuant to that contract, she again worked as an independent contractor. *Id*. Worldwide's contract to provide linguists to NATO headquarters in Kosovo ended in October 2002. *Id*. ¶ 5. Brian Remmey, Worldwide's vice-president of operations, recommended that Gavrilovic serve as an assistant site manager on a Worldwide project serving the United States military in Afghanistan. *Id*. ¶ 6.[2]

Gavrilovic visited Worldwide's home office in Rumford, Maine on December 1, 2002 and stayed in Rumford until she left for her deployment to Afghanistan on December 5, 2002. *Id*. ¶ 7. She was there for the purpose of receiving training in the company's policies, practices and procedures. Plaintiff's Statement of Additional Material Facts Not in Dispute ("Plaintiff's Additional SMF"), commencing at page 20 of Plaintiff's Opposing SMF, ¶ 113; Deposition of Tanja Gavrilovic

---

extent that a party, in qualifying a statement, has expressly controverted all or a portion of the underlying statement, I have deemed it admitted.

[2] Gavrilovic purports to qualify this statement, *see* Plaintiff's Opposing SMF ¶ 6; however, her qualification is not substantially (*continued on next page*)

("Gavrilovic Dep."), Tabs A-C to Affidavit of Stephen P. Beale ("Beale Aff.") (Docket No. 47), at 169-72.[3]  While there, she obtained a form letter titled "Employee Candidate Welcome Letter" that was addressed "Dear Potential Employee" and not specifically addressed to her.  Plaintiff's Additional SMF ¶ 114; Defendant's Reply SMF ¶ 114.[4]  Gavrilovic's costs of transportation to Rumford for training were paid by Worldwide.  *Id*. ¶ 116.  Her lodging while she was receiving training in Rumford also was paid for by Worldwide.  *Id*.  On the way to the airport to depart for Afghanistan, Worldwide president Costa bought warm clothing and boots for Gavrilovic using Worldwide funds.  *Id*.  Gavrilovic was not required to bring any special equipment or materials with her to Rumford prior to departing for Afghanistan.  Plaintiff's Additional SMF ¶ 116; Gavrilovic Dep. at 528.[5]  Worldwide paid for those parts of Gavrilovic's air travel to Afghanistan that were on commercial airlines.  Plaintiff's Additional SMF ¶ 121; Defendant's Reply SMF ¶ 121.

While at Worldwide headquarters receiving training, Gavrilovic was told by Costa that her function in Afghanistan was to ingratiate herself with Captain Anderson, the commanding military linguist officer, and do whatever it took to advance Worldwide's contractual interests.  *Id*. ¶ 122.  Gavrilovic interpreted this instruction to mean that she should engage in unsavory behavior if that was what it took to assist Worldwide.  *Id*.[6]  Costa told Gavrilovic that she was fortunate to be in a

---

[3] supported by the record citations given and is on that basis disregarded.

Worldwide denies paragraph 113, *see* Defendant's Reply Statement of Material Facts in Response to Plaintiff's Opposing Statement of Material Facts in Opposition to Defendant's Motion for Summary Judgment ("Defendant's Reply SMF") (Docket No. 50) ¶ 113; however, inasmuch as I must view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant, I have set forth so much of her statement as is supported by the citations given.

[4] As Worldwide points out, *see* Defendant's Reply SMF ¶ 114, Gavrilovic's statement is not supported by the citations given.  Therefore, I use its version, which is appropriately supported.

[5] Worldwide's request to strike this sentence on the basis that it is unsupported by the citation given, *see* Defendant's Reply SMF ¶ 116, is overruled.  Worldwide otherwise qualifies the paragraph, *see id*., asserting that (i) Costa testified that he obtained items for Gavrilovic "because she didn't have the appropriate clothing, I felt, for Afghanistan[,]" Deposition of Lawrence Costa ("Costa Dep."), Tab H to Beale Aff., at 128, and (ii) Gavrilovic has asserted that she was indeed adequately prepared for Afghanistan and did not need his assistance, *see* Gavrilovic Dep. Exh. 3, Tab D to Beale Aff., at [1]-[2].

[6] Worldwide purports to qualify this statement, *see* Defendant's Reply SMF ¶ 122; however, its qualification is unsupported by the citation given and is on that basis disregarded.  Worldwide's objection to Gavrilovic's statement on the basis that it reflects her subjective interpretation of Costa's comments, *see id*., is overruled.  A sexual-harassment plaintiff's subjective interpretation of (*continued on next page*)

management position because females are not capable of being managers, especially those without formal education such as herself.  Plaintiff's Additional SMF ¶ 123; Plaintiff's Answers to Defendant's First Set of Interrogatories ("Plaintiff's Interrog. Ans."), Tab N to Affidavit of Christopher T. Vrountas ("Vrountas Aff.") (Docket No. 38), at 9, ¶ 10.  He further informed her that she should count her blessings because she was one of those women who would actually enjoy staying home and taking care of a family.  *Id.*[7]  Before Gavrilovic left Worldwide headquarters in Rumford to go to Afghanistan, she was warned by a Worldwide female employee to "watch out for" Kevin Adams, whose comments and conduct while at the Worldwide home office were stated to be extremely out of line.  Plaintiff's Additional SMF ¶ 141; Defendant's Reply SMF ¶ 141.[8]

Gavrilovic signed an "Independent Sub-Contractor Agreement" on December 1, 2002 ("December Agreement") related to work in Bagram, Afghanistan.  Defendant's SMF ¶ 8; Plaintiff's Opposing SMF ¶ 8.  The December Agreement governed the terms of her relationship with Worldwide.  *Id.*[9]  The December Agreement did not provide employee benefits.  Defendant's SMF ¶ 9; December Agreement at 1, ¶ 3.[10]  The December Agreement explicitly stated that Gavrilovic was

---

allegedly harassing comments can be relevant.  *See, e.g.*, *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002) (to prove claim of hostile-work-environment sexual harassment, plaintiff must show, *inter alia*, that conduct was both objectively and subjectively offensive).  Worldwide's complaints about the asserted irrationality and baselessness of Gavrilovic's interpretation, *see* Defendant's Reply SMF ¶ 122, go to its weight, not its admissibility.

[7] Worldwide denies that Costa made such remarks, *see* Defendant's Reply SMF ¶ 123; however, I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

[8] My recitation substitutes the phrase "a Worldwide female employee" for Gavrilovic's original phrase "another female employee of Worldwide," which, as Worldwide points out, *see* Defendant's Reply SMF ¶ 141, intimates that Gavrilovic was an employee – one of the legal issues in this case.  Worldwide otherwise qualifies the statement, *see id.*, asserting that Gavrilovic believed the person making the comment to have been a gossip, *see* Gavrilovic Dep. at 222, 288.

[9] Gavrilovic qualifies this assertion, *see* Plaintiff's Opposing SMF ¶ 8, stating that (i) she believed she was employed by Worldwide to serve as a site manager in Bagram, *see* Gavrilovic Dep. Exh. 3 at [1], and (ii) although the December Agreement characterized her as a linguist, engaged to provide translation/interpretation services, she does not speak any of the several languages or dialects spoken in Afghanistan and was not hired by Worldwide to work as a linguist in Afghanistan, *see* December Agreement, Tab F to Vrountas Aff., at 1; Gavrilovic Dep. at 161-64.

[10] Gavrilovic purports to deny this statement, asserting that the December Agreement provided lodging, meal and travel allowances notwithstanding its express statement that no employee benefits were provided.  *See* Plaintiff's Opposing SMF ¶ 9.  However, it is not self-evident that lodging, meal and travel allowances qualify as "employee benefits," and Gavrilovic provides no evidence or authority in support of that proposition.  Thus, she does not succeed in controverting the underlying statement.

an independent contractor, consistently referred to her as a subcontractor and never termed her an employee. Defendant's SMF ¶ 10; Plaintiff's Opposing SMF ¶ 10. It expressly provided for a term beginning on December 1, 2002 and continuing until November 30, 2003. *Id.*[11] Gavrilovic testified that the December Agreement erroneously referred to her as a linguist. *Id.* ¶ 19.[12] The entire content of the December Agreement did not accurately describe the content of her job. Plaintiff's Additional SMF ¶ 136; Defendant's Reply SMF ¶ 136. The "meat" of the document did not match her job functions. *Id.*[13]

Remmey testified that Worldwide had no form of employment contract. Plaintiff's Additional SMF ¶ 115; Deposition of Brian O. Remmey ("Remmey Dep."), Tabs E-F to Beale Aff., at 325.[14] When Gavrilovic was training in the Rumford home office, no company officer or manager ever told her that Worldwide would consider her to be an independent contractor. Plaintiff's Additional SMF ¶ 117; Gavrilovic Dep. at 530.[15] At all relevant times, Worldwide offered medical benefits to its employees. Defendant's SMF ¶ 11; Plaintiff's Opposing SMF ¶ 11. Rumford staff were "employees," but linguists and site managers were "independent contractors." *Id.*[16]

---

[11] I omit Worldwide's further statement that Gavrilovic's resume described her as a "subcontractor to the U.S. Army," *see* Defendant's SMF ¶ 10, which Gavrilovic successfully controverts, *see* Plaintiff's Opposing SMF ¶ 10; Gavrilovic Dep. at 218-19; Gavrilovic Dep. Exh. 10, Tab D to Beale Aff.

[12] My recitation reflects Gavrilovic's qualification.

[13] I omit Gavrilovic's further statement (which Worldwide denies) that the December Agreement did not accurately describe the terms of her employment by Worldwide, *see* Plaintiff's Additional SMF ¶ 136, on the basis that it is not supported by the citation given.

[14] Worldwide denies paragraph 115, *see* Defendant's Reply SMF ¶ 115; however, I have set forth so much of it as is supported by the citations given, in keeping with the proviso that I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

[15] I sustain Worldwide's objection to the first sentence of paragraph 117 (and hence omit it) on the basis that Gavrilovic's subjective belief that she was an "employee" is not a "material" fact. *See* Plaintiff's Additional SMF ¶ 117; Defendant's Reply SMF ¶ 117. While Worldwide also denies paragraph 117, *see* Defendant's Reply SMF ¶ 117, I have set forth so much of the balance of it as is supported by the citations given.

[16] Gavrilovic qualifies this statement, asserting, *inter alia*, that per Remmey's testimony linguists and site managers were given independent contractor contracts to sign because they were not located in the state of Maine, and that was how Costa treated those individuals when Remmey arrived at Worldwide. *See* Plaintiff's Opposing SMF ¶ 11; Remmey Dep. at 178.

Worldwide personnel did not control or direct Gavrilovic's day-to-day activities while she was deployed in Bagram. *Id.* ¶ 13.[17] Gavrilovic received instruction from the United States military for daily missions. *Id.*[18] Gavrilovic's job, as an assistant site manager, was to report to Worldwide information about the linguists for billing and administration purposes. *Id.* ¶ 14. She submitted time sheets and expense requests on behalf of the linguists under her supervision and handled security matters when necessary. *Id.* She monitored the client's satisfaction level regarding the linguists deployed in theater and reported any client issues to Worldwide. *Id.* It was her responsibility to pass on the necessary information and comply with military conduct rules on base. *Id.* Worldwide did not control her activities in this regard. *Id.*[19]

Gavrilovic reported linguist roster changes to the company home office on a matrix form that was a Worldwide document. Plaintiff's Additional SMF ¶ 119; Defendant's Reply SMF ¶ 119. While she was in Bagram, Adams modified the matrix, and the modified matrix was the form used exclusively by Worldwide personnel thereafter. *Id.*[20] Gavrilovic had no authority to create forms or procedures for her use in Bagram. *Id.* ¶ 120.[21] Gavrilovic took instructions to do specific acts from Worldwide personnel in the Rumford office and performed those tasks she was instructed to perform

---

[17] I omit Worldwide's statement that it did not offer medical benefits to Gavrilovic, *see* Defendant's SMF ¶ 12, which she successfully controverts, *see* Plaintiff's Opposing SMF ¶ 12; Gavrilovic Dep. at 241-42; Costa Dep. at 185-88.

[18] Gavrilovic qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 13, asserting, *inter alia*, that (i) there was a specific chain of command of Worldwide personnel in Bagram, in which she and John Bishop, as assistant site managers for Worldwide linguists assigned to separate military compounds, reported to Kamran Afzal, overall Bagram site manager, who in turn reported to Kevin Adams, regional project manager for southwest Asia, *see* Gavrilovic Dep. at 535-37, and (ii) although she received daily requests for linguists from the military, her duties included daily communication with the Rumford home office regarding a wide variety of personnel, financial, security and other issues, *see id.* at 198-201.

[19] Gavrilovic admits the last sentence of paragraph 14 only insofar as the assertion that Worldwide did not control her activities relates to the military conduct clause at the end of the preceding sentence. *See* Plaintiff's Opposing SMF ¶ 14.

[20] Worldwide purports to qualify paragraph 119; however, its statement that a different individual changed the matrix has no apparent relevance, and its assertion that Adams was a subcontractor is unsupported by any record citation. *See* Defendant's Reply SMF ¶ 119.

[21] I omit the balance of paragraph 120, which, as Worldwide points out, is unsupported by the citation given. *See* Defendant's Reply SMF ¶ 120. Worldwide otherwise qualifies paragraph 120, *see id.*, asserting, in cognizable part, that (i) Costa testified that Gavrilovic had no responsibility for establishing any policies or procedures on her own initiative, Costa Dep. at 133, and (ii) Gavrilovic testified that she ran Worldwide's Bagram post by herself, *see* Gavrilovic Dep. at 290-91.

as they related to Worldwide's roster of linguists in Bagram.  Plaintiff's Additional SMF ¶ 137; Gavrilovic Dep. at 253-55.  She also answered to the chain of command of Worldwide supervisors on the ground in southwest Asia, which structure had Adams at the top, Afzal reporting to him and Gavrilovic and Bishop reporting to Afzal.  Plaintiff's Additional SMF ¶ 137; Gavrilovic Dep. at 535-36.[22]

Worldwide did not provide Gavrilovic with work space, a telephone, internet access, a desk or a table.  Defendant's SMF ¶ 15; Plaintiff's Opposing SMF ¶ 15.  Her working space, telephone, internet access and office furniture were provided by the United States military.  *Id*.  United States military police, not Worldwide, controlled the premises at the Bagram Air Base where Gavrilovic was deployed.  *Id*.[23]  Gavrilovic received a Form 1099 reflecting payments to her from Worldwide. *Id*. ¶ 16.  She did not receive a Form W-2 reflecting payments to her from Worldwide.  *Id*. ¶ 17. Worldwide did not withhold taxes from the money paid to Gavrilovic under the December Agreement. *Id*.  The United States military controlled all air transportation to and from Bagram Air Base.  *Id*. ¶ 18.

While at the Bagram military headquarters Gavrilovic used a laptop computer provided by Worldwide.  Plaintiff's Additional SMF ¶ 118; Defendant's Reply SMF ¶ 118.  Circulation of intra-company e-mails was provided by a Worldwide server.  *Id*.  Although each company manager had a password, access to the company computer in Bagram was by means of the primary site manager's password.  *Id*.[24]

---

[22] Worldwide denies paragraph 137, *see* Defendant's Reply SMF ¶ 137; however, I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

[23] Gavrilovic qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 15, asserting that (i) Worldwide provided her and other Worldwide personnel in Bagram with a laptop computer to be used by all, *see* Remmey Dep. at 114, and (ii) all Worldwide personnel worked at the same rectangular table in a tent in Bagram and used that laptop, *see* Gavrilovic Dep. at 295-97.

[24] I omit the fourth sentence of paragraph 118, which, as Worldwide points out, is not supported by the citation given.  *See* Defendant's Reply SMF ¶ 118.  Worldwide otherwise qualifies paragraph 118, *see id*., asserting that Costa testified that Worldwide "may have shipped over a laptop at one time" and "e-mail was free; the military provided that[,]" Costa Dep. at 137.

Gavrilovic claimed that Zoran Todorovski, a Worldwide site manager in Kosovo, sexually harassed her during her job interview with Worldwide in or about November 2001. Defendant's SMF ¶ 25; Plaintiff's Opposing SMF ¶ 25. Gavrilovic complained about Todorovski's alleged sexual harassment to Jamie Williamson and Brian Remmey, both management executives of Worldwide. *Id.* ¶ 26.[25] After Gavrilovic complained to Williamson regarding Todorovski's sexually harassing behavior, Williamson gave her his business card, on the back of which he had written words to the effect that "the whisper of a pretty woman is more effective than the roar of a lion." Plaintiff's Additional SMF ¶ 124; Gavrilovic Dep. at 81.[26] Remmey traveled to Kosovo, terminated Todorovski's contract with Worldwide and ordered him to leave Kosovo. Defendant's SMF ¶ 28; Plaintiff's Opposing SMF ¶ 28.[27]

In March 2002 Jenner Bryce Edelman complained by e-mail to Kevin Ellingwood, a Worldwide manager in the Rumford home office, that Kevin Adams had sexually harassed her in Uzbekistan. *Id.* ¶ 31. Adams was a site manager in Uzbekistan at the time Edelman sent her e-mail to Ellingwood. *Id.* ¶ 32. Edelman was a linguist in that location at that time. *Id.* Ellingwood brought Edelman's e-mail complaint to Remmey's attention. *Id.* ¶ 33.[28] Remmey conferred with Costa as to how to proceed in response to the complaint. *Id.* ¶ 34. Costa decided that Adams should be immediately removed from theater to separate him from Edelman. *Id.* ¶ 35. Costa instructed Remmey

---

[25] Gavrilovic qualifies this statement, asserting that she complained about Todorovski to Williamson in late November 2001 and to Remmey in mid-January 2002. *See* Plaintiff's Opposing SMF ¶ 26; Gavrilovic Dep. at 98-99; Remmey Dep. at 35.

[26] Worldwide denies paragraph 124, *see* Defendant's Reply SMF ¶ 124; however, I credit the version of Gavrilovic, as nonmovant. Worldwide's objection that the alleged comments written on the back of the card are irrelevant, *see id.*, is overruled.

[27] I omit Worldwide's statement that, based in part on Gavrilovic's complaint, it sent Remmey to Kosovo to terminate Todorovski's contract and remove him from theater operations. *See* Defendant's SMF ¶ 27. Gavrilovic denies that Remmey was sent in part because of her complaint, asserting that he was sent to deal with other reported misconduct and was not even aware of her complaint until after he arrived in Kosovo in mid-January 2002. *See* Plaintiff's Opposing SMF ¶ 27; Remmey Dep. at 22-24, 35.

[28] My recitation incorporates Gavrilovic's qualification.

to go to Uzbekistan, terminate Adams' contract and order him out of the theater. *Id*. Worldwide removed him from the theater in Uzbekistan. *Id*.[29]

Remmey and Adams had served together in the United States Special Forces. *Id*. ¶ 36. Based upon that experience, Remmey believed that the conduct alleged by Edelman was inconsistent with what he knew of Adams. *Id*. He knew Adams to have been a gentleman who could be trusted and an adult who was responsible. *Id*. Remmey told Costa that the alleged sexually harassing behavior was out of character for Adams. *Id*. ¶ 37. Remmey said that Adams was a person of honor and integrity. *Id*. Edelman told Remmey that she was a "good liar" and that she gets what she wants by lying. *Id*. ¶ 39. Remmey reported this statement to Costa. *Id*. ¶ 40. Remmey told Costa that the Adams described in the report of sexual harassment was "not the Kevin Adams [I] know, the man [I] served with in special forces." *Id*.[30] After Remmey told Costa that Edelman described herself as a good liar, Worldwide, in keeping with Remmey's recommendation to Costa, engaged Adams to work as a site manager for the United States military in Guantanamo Bay, Cuba. *Id*. ¶ 41.[31]

Edelman's contract with Worldwide ended in September 2002. *Id*. ¶ 42. She left Worldwide to pursue graduate studies in Europe. *Id*. Worldwide eventually lost its contract to provide linguists to the United States military in Guantanamo Bay, Cuba. *Id*. ¶ 43. After Edelman left to pursue her graduate studies, Worldwide reassigned Adams to serve as a site manager in Afghanistan. *Id*.[32]

---

[29] I omit Worldwide's further statement that it also terminated Adams' contract as a result of Edelman's complaint, *see* Defendant's SMF ¶ 35, which Gavrilovic disputes, stating that Costa was deterred from terminating Adams by Remmey, *see* Plaintiff's Opposing SMF ¶ 35; Costa Dep. at 143-45.

[30] I omit Worldwide's further statement that Remmey told Costa this approximately one month after Worldwide terminated Adams' contract, *see* Defendant's SMF ¶ 40, which, as Gavrilovic points out, *see* Plaintiff's Opposing SMF ¶ 40, is not supported by the citation given.

[31] I omit Worldwide's further statement that Adams was never assigned to work in the same theater as Edelman, *see* Defendant's SMF ¶ 41, which, as Gavrilovic points out, *see* Plaintiff's Opposing SMF ¶ 41, makes no sense as written.

[32] I omit Worldwide's further statement that in light of Remmey's knowledge of Adams' character, Edelman's admission and the fact that she voluntarily left Worldwide to pursue other opportunities, it was appropriate to give Adams a "second chance" and reassign him to Afghanistan. *See* Defendant's SMF ¶ 44. I sustain Gavrilovic's objection that, as worded, the statement is a conclusory assertion of belief, not a statement of fact. *See* Plaintiff's Opposing SMF ¶ 44.

Gavrilovic claims that Adams sexually harassed her in December 2002 and January 2003. *Id.* ¶ 45. Adams subjected Gavrilovic to numerous egregious and inappropriate sexual advances while she was working under his supervision. Plaintiff's Additional SMF ¶ 142; Defendant's Reply SMF ¶ 142. Examples of some of the comments Adams made to Gavrilovic include suggesting that he stay in her hotel room while she was showering and changing, asking the style and color of the undergarments she was wearing and saying that if she "ever wanted to get nekid [sic] [she should] let [him] know first." *Id.* Adams also regularly grabbed at her buttocks and thighs while working in the Worldwide work space in Bagram and frequently opened the divider to her sleeping quarters to watch her change despite being told by her to stop. *Id.*[33]

Gavrilovic left Rumford, Maine for Afghanistan on December 5, 2002. Defendant's SMF ¶ 47; Plaintiff's Opposing SMF ¶ 47. She was in Turkey from December 5-7, 2002, then in Uzbekistan from December 7-19, 2002, then in Afghanistan again from December 19, 2002 to January 1, 2003. *Id.* She went to Turkey again from January 1-3, 2003, then to Uzbekistan from January 3-9, 2003, then back to Afghanistan from January 9, 2003 through March 26, 2003. *Id.* On March 26, 2003 she left Afghanistan and traveled to Landstuhl, Germany for gall-bladder surgery. *Id.* She did not return to Afghanistan until May 5, 2003. *Id.* She finally left Afghanistan for the United States on May 9, 2003. *Id.*[34]

Gavrilovic was the only Worldwide site manager present at Bagram Air Base for approximately two weeks beginning about February 1, 2003. *Id.* ¶ 48. According to Gavrilovic, she was essentially in charge of Worldwide operations at Bagram during a ten- to fourteen-day period. *Id.*

---

[33] Worldwide admits that Gavrilovic testified as set forth in paragraph 142 but denies that the harassment occurred or that her testimony is credible. *See* Defendant's Reply SMF ¶ 142. I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

[34] Gavrilovic qualifies paragraph 47, *see* Plaintiff's Opposing SMF ¶ 47, noting that these periods of time are only approximations as stated in her deposition, *see* Gavrilovic Dep. at 225-30.

¶ 49.  The ten- to fourteen-day period when Gavrilovic was the sole Worldwide manager in Bagram was interrupted when Adams returned for one day on February 19, 2003.  Plaintiff's Additional SMF ¶ 139; Gavrilovic Dep. at 385-86.[35]  Bishop did not return to Bagram until after February 19.  Plaintiff's Additional SMF ¶ 139; Gavrilovic Dep. at 387-88.  Gavrilovic viewed Bishop as her equal, not someone to whom she would report.  Defendant's SMF ¶ 50; Plaintiff's Opposing SMF ¶ 50.  She never complained about any sexual harassment by Bishop.  *Id*.

Except for one brief meeting, Adams was not present at the Bagram Air Base from approximately February 1, 2003 through May 19, 2003.  *Id*. ¶ 51.[36]  He did not commit any act of sexual harassment during this one brief meeting.  *Id*.  Throughout the period of her deployment to Afghanistan, including her stays in Turkey and Uzbekistan, Gavrilovic knew how to contact Worldwide, including, but not limited to, Remmey and Ellingwood.  *Id*. ¶ 52.  During a trip through various southwest Asian countries, Gavrilovic had at least one telephone conversation with Remmey.  *Id*. ¶ 53.[37]  Gavrilovic regularly contacted the Worldwide home office in Rumford, Maine by e-mail and telephone throughout her time in Afghanistan.  *Id*. ¶ 54.  She regularly communicated in this fashion with the Worldwide home office from February 1, 2003 through March 19, 2003.  *Id*.  Gavrilovic contacted Ellingwood, Remmey and other Worldwide employees and executives at the Worldwide home office throughout her time in Afghanistan.  *Id*. ¶ 55.

Gavrilovic never complained to anyone at Worldwide of any sexual harassment by Adams or anyone else from the time she was deployed to Afghanistan through the time she left Afghanistan on or about March 26, 2003.  *Id*. ¶ 56. She left Afghanistan on March 26, 2003 to seek medical treatment at

---

[35] Worldwide denies this statement, *see* Defendant's Reply SMF ¶ 139; however, I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

[36] Gavrilovic qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 51, noting that the one brief meeting with Adams to which Worldwide refers took place on February 19, 2003, *see* Gavrilovic Dep. at 383-85.

[37] My recitation reflects Gavrilovic's qualification.

a United States military medical facility in Landstuhl, Germany, for a gall-bladder problem. *Id*.
Bishop accompanied her to Landstuhl. *Id*. Prior to her gall-bladder surgery on March 31, 2003,
Gavrilovic told Bishop about some of Adams' alleged harassing conduct. *Id*. ¶ 57.[38] Gavrilovic
viewed Bishop as her "equal"; he was not her boss and did not have a higher position in Bagram or
with Worldwide. *Id*. ¶ 58. Gavrilovic did not ask Bishop to tell anyone about, or do anything with,
the information she gave him. *Id*. ¶ 59. She told Bishop that she would complain to Costa and
Remmey together about Adams' conduct when they arrived in Bagram. *Id*.[39] Gavrilovic knew
Remmey to be someone who could get results when it came to issues of sexual harassment. *Id*. ¶ 29.
Gavrilovic testified that she did not feel she had sufficient privacy to complain to Worldwide about
Adams via telephone and did not feel comfortable sending her complaint via e-mail. *Id*. ¶ 30. She did
not trust any communications that she might make to Worldwide to be treated confidentially except
through one-on-one conversations in person. Plaintiff's Additional SMF ¶ 126; Defendant's Reply
SMF ¶ 126. Gavrilovic wished to convey her complaints regarding Adams' behavior to Costa, but
only with Remmey present because she had confidence in Remmey. *Id*.[40]

    Gavrilovic never complained to Ellingwood about any sexual harassment by Adams.
Defendant's SMF ¶ 61; Plaintiff's Opposing SMF ¶ 61. She never complained to Jamie Williamson, a
vice-president of Worldwide with whom she was acquainted, who was available by telephone and e-
mail, of any sexual harassment by Adams. *Id*. ¶ 62. She never complained to Costa about any sexual
harassment by Adams. *Id*. ¶ 63. She did not complain to Remmey about any sexual harassment by

---

[38] My recitation incorporates Gavrilovic's qualification.
[39] My recitation incorporates Gavrilovic's qualification.
[40] Worldwide admits that Gavrilovic testified as reflected in paragraph 126 but denies the statement on the basis that her beliefs were unreasonable. *See* Defendant's Reply SMF ¶ 126. Nonetheless, I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

Adams until May 6, 2003.  *Id.* ¶ 64.[41]  There was nothing Remmey could have done to prevent the alleged sexual harassment because he did not know anything about it prior to May 6, 2003.  *Id.* ¶ 65.[42]  There was nothing Ellingwood could have done to prevent the alleged sexual harassment because he did not know anything about the problem.  *Id.* ¶ 66.  There was nothing Worldwide could have done to prevent the alleged sexual harassment because the company did not know anything about the problem.  Defendant's SMF ¶ 67; Remmey Dep. at 110, 121-23.[43]

When Gavrilovic spoke to Remmey about Adams for the first time on May 6, 2003, Remmey told Gavrilovic that Edelman had previously complained to Worldwide of sexual harassment by Adams.  Defendant's SMF ¶ 68; Plaintiff's Opposing SMF ¶ 68.  Remmey told Gavrilovic that Edelman had complained by e-mail to Ellingwood.  *Id.*  Remmey told Gavrilovic that Worldwide had removed Adams from Edelman's work environment following her complaint of sexual harassment against him.  *Id.* ¶ 69.[44]

Approximately two days after his discussion with Gavrilovic, on or about May 8, 2003, Remmey worked on a computer terminal at the Bagram Air Base site.  *Id.* ¶ 70.  At Bagram, every person had his or her own password to get into the computer system.  *Id.* ¶ 71.  Individuals were expected to log off the computer when done, although it was not unexpected that persons working literally side-by-side could share each other's screen while working in proximity together.  *Id.*  The computer system had shared files, where several people could be expected to access documents, as well as personal folders that were expected to be accessible only by use of an individual's password.

---

[41] Gavrilovic qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 64, asserting that while she did not specifically mention Adams by name or state the nature of the problem, she told Remmey by phone or e-mail while she was in Afghanistan that she had a work-related problem she would discuss with him in the future, *see* Remmey Dep. at 105-07.

[42] My recitation incorporates Gavrilovic's qualification.

[43] Gavrilovic purports to deny this statement; however, she relies on the fact that she told Bishop about the harassment while in Germany.  *See* Plaintiff's Opposing SMF ¶ 67.  It is not clear whether Bishop was an "employee" of Worldwide.  In any event, Gavrilovic concedes that, to her knowledge, Bishop did not impart any of the content of her statements to senior Worldwide management.  *See id.*  Thus, she does not effectively controvert the underlying statement.

*Id*.  Documents deleted from one's personal folder would go to the individual's personal recycle bin, also accessible only by using the author's individual password.  *Id*.[45]

While examining the contents of Afzal's computer recycle bin prior to deleting them, Remmey found two documents that purported to be an exchange of e-mails among a number of individuals associated with Worldwide.  *Id*. ¶ 72.[46]  Remmey read the two documents he found in the recycle bin, a shared file on the company's common desktop accessible to all members of Worldwide's management.  *Id*. ¶ 74.[47]  Remmey altered the format and content of the two documents.  *Id*. ¶ 75.[48] Remmey merged five e-mails into a composite document.  *Id*. ¶ 77.[49]  He deleted and destroyed the original documents he had found in the recycle bin after he edited the documents.  *Id*. ¶ 78.  On May 8, 2003 Remmey sent Costa an e-mail forwarding the new document he had created from the recycle bin. *Id*. ¶ 79.  In that e-mail, Remmey complained about the comments made about Gavrilovic and about the conduct of others deployed in Afghanistan, but did not mention Adams' alleged sexual harassment of Gavrilovic.  *Id*.[50]

The purported e-mail containing the term "Bagram Fuck Toy" ("BFT") constitutes the sole basis  for Gavrilovic's defamation claim.  *Id*. ¶ 89.  Afzal was the originator of the e-mail report containing the reference to Gavrilovic as the BFT.  Plaintiff's Additional SMF ¶ 132; Costa Dep. at

---

[44] My recitation incorporates Gavrilovic's qualification.

[45] Gavrilovic purports to qualify paragraph 71, *see* Plaintiff's Opposing SMF ¶ 71; however, her qualification is not  supported by the citation provided and is on that basis disregarded.

[46] Gavrilovic qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 72, asserting that Remmey was examining the contents of Afzal's recycle bin prior to deleting entries that he, Remmey, had made, *see* Remmey Dep. at 113-15.

[47] My recitation incorporates Gavrilovic's qualification.

[48] Gavrilovic qualifies this statement, *see* Plaintiff's Opposing SMF ¶ 75, asserting that Remmey deleted the headers of the individual e-mails, which indicated to whom and from whom they were sent, as well as the "little arrowheads," or "carrots," in order to "clean up" the documents he was compiling but he did not delete any of the substantive content from the body of the e-mails themselves, *see* Remmey Dep. at 328-29.

[49] My recitation incorporates Gavrilovic's qualification.

[50] My recitation incorporates Gavrilovic's qualification.

174-78.[51]   When Costa read the BFT reference to Gavrilovic in the e-mail exchange among Worldwide's managers, he was upset by the vulgarity of the remark.  Plaintiff's Additional SMF ¶ 140; Defendant's Reply SMF ¶ 140.  Costa immediately instructed Worldwide vice-president Williamson to prepare a counseling statement for Afzal regarding use of such a vulgar phrase in e-mail traffic.  *Id*.[52]  While working Afghanistan, Gavrilovic admittedly engaged in sexual relations with a United States Army sergeant, which she characterized as a "monogamous" relationship.  Defendant's SMF ¶ 90; Plaintiff's Opposing SMF ¶ 90.[53]

Remmey told Costa about Adams' sexually harassing behavior of Gavrilovic in a telephone call to Costa on May 8, 2003.  Plaintiff's Additional SMF ¶ 127; Remmey Dep. at 140-42.  In an e-mail sent at virtually the same time, Remmey stated that he would speak to Costa further about personnel matters when he saw him.  Plaintiff's Additional SMF ¶ 127; Remmey Dep. at 144-45.[54] Costa, by means of a directive to Williamson, ordered Gavrilovic back to the United States after Remmey forwarded the e-mail compilation to Costa on May 8, 2003.  Plaintiff's Additional SMF ¶128; Defendant's Reply SMF ¶ 128.  On the same date, Costa directly ordered Remmey to return to the United States.  *Id*.[55]

Before leaving Afghanistan, Remmey printed out the combined document he created from the documents he found in Afzal's recycle bin and showed it to Gavrilovic on May 8, 2003.  Defendant's

---

[51] Worldwide objects that Gavrilovic's citations to deposition testimony of Costa and Ellingwood do not support the statement made and that her citation to her own deposition testimony is inadmissible because not based on personal knowledge or other foundation. *See* Defendant's S/J Reply ¶ 132.  Costa describes corrective action taken against Afzal as a result of use of the phrase BFT.  Costa Dep. at 174-78.  Thus, his testimony adequately supports the statement that Afzal was its originator.

[52] I omit Gavrilovic's further statement that "Ellingwood considered the email characterization of Gavrilovic a 'problem,'" Plaintiff's Additional SMF ¶ 140, which, as Worldwide points out, *see* Defendant's Reply SMF ¶ 140, is not supported by the citation given.

[53] I have omitted the first sentence of paragraph 90, *see* Defendant's SMF ¶ 90, sustaining Gavrilovic's objection that it is argumentative, *see* Plaintiff's Opposing SMF ¶ 90.

[54] Worldwide denies this statement, *see* Defendant's Reply SMF ¶ 127; however, I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

[55] Worldwide qualifies paragraph 128, *see* Defendant's Reply SMF ¶ 128, asserting that Costa had received complaints about Gavrilovic's performance and that he was concerned about improper access to confidential information by Remmey, *see* Costa Dep. at (*continued on next page*)

SMF ¶ 82; Plaintiff's Opposing SMF ¶ 82.  Upon seeing the document created by Remmey, Gavrilovic

telephoned Worldwide's home office in Rumford and asked to speak to Costa.  *Id*. ¶ 83.  She spoke

with Costa's assistant, Brenda Eggert, and to Williamson.  *Id*.  During that telephone call she did not

mention any alleged sexual harassment by Adams.   *Id*.  It took approximately ten minutes for

Gavrilovic to look for a telephone, locate it, make the telephone call to Rumford, speak with Costa's

assistant and Williamson and conclude the call.   *Id*.  Williamson ordered Gavrilovic to return to the

United States immediately without permitting her to speak directly to Costa.  Plaintiff's Additional

SMF ¶ 129; Defendant's Reply SMF ¶ 129.[56]  Prior to May 8, 2003 Costa had received no complaints

of job non-performance or poor performance by Gavrilovic from any subordinate other than Afzal.  *Id.*

¶ 130.[57]  Ellingwood, director of Worldwide's international operations at that time, had no complaints

about Gavrilovic's job performance in Bagram.  Plaintiff's Additional SMF ¶ 131; Deposition of

Kevin Ellingwood ("Ellingwood Dep."), Tab I to Beale Aff., at 60.[58]

When Gavrilovic was ordered back to the United States by Costa, through Williamson, on May

8, 2003, Worldwide, not Gavrilovic, paid for the civil parts of the flight from Afghanistan to the

United States.  Plaintiff's Additional SMF ¶ 121; Defendant's Reply SMF ¶ 121.

Remmey met with Costa in Rumford, Maine on or about May 13, 2003.  Defendant's SMF

¶ 81; Plaintiff's Opposing SMF ¶ 81.  Prior to that meeting Remmey prepared a report titled

"Assessment of Corporate Problems in Theatre."  *Id*.  The report concerned Remmey's "observations

---

177-80.

[56] Worldwide objects that Gavrilovic's statement that Williamson did not permit her to speak directly to Costa is not supported by the record citation given, *see* Defendant's Reply SMF ¶ 129; however, the objection is overruled.  Worldwide otherwise qualifies the statement, asserting that Williamson ordered Gavrilovic back to the United States to "bring her back and sort all this out."  *See id.*; Costa Dep. at 178.

[57] Worldwide qualifies this statement, *see* Defendant's Reply SMF ¶ 130, asserting that Costa testified in the cited portion of the record that he had not received any reports of job nonperformance by Gavrilovic "to [his] recollection[,]" Costa Dep. at 178.

[58] Worldwide denies this statement, *see* Defendant's Reply SMF ¶ 131; however, I view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant.

that concerned [him] in Afghanistan." *Id.*[59] Remmey did not mention Adams' alleged harassment of Gavrilovic in his report, nor did he mention it during his meeting with Costa. *Id.*

The sole document that forms the basis of Gavrilovic's defamation and false-light claims was altered by Remmey. *Id.* ¶ 85. Remmey destroyed the original documents upon which the composite document now relied upon by Gavrilovic is purportedly based, after he merged and edited them. *Id.*[60] There exists no direct evidence that the actual e-mails were ever shown to anyone other than Ellingwood. Defendant's SMF ¶ 87; Costa Dep. at 169-73.[61]

The document created by Remmey from the two documents he claimed to have seen in Afzal's recycle bin purports to constitute a report by Afzal to Ellingwood on how to employ Freshta Panjshiri, the person Ellingwood and Afzal anticipated would replace Gavrilovic as assistant site manager at Bagram. Defendant's SMF ¶ 88; Plaintiff's Opposing SMF ¶ 88. It further expressly purports to constitute a report to keep Ellingwood apprised of the status of activity in the theater. *Id.* The composite document also indicates that certain Worldwide managers contemplated removing Gavrilovic from the Bagram site prior to Worldwide having received any complaint by Gavrilovic about the alleged sexual harassment by Adams. *Id.* ¶ 91. The documents were created no later than May 1, 2003, before Costa, the person who decided to remove Gavrilovic from the theater, had any knowledge of her complaint. *Id.*[62] Panjshiri is a woman who was deployed in Bagram on the heels of Gavrilovic's departure, and she eventually replaced Adams as site manager of the Bagram Air Base

---

[59] My recitation incorporates Gavrilovic's qualification.

[60] I omit Worldwide's statement that Gavrilovic admittedly does not know and has no basis for believing that the purported e-mails were truly published to anyone, *see* Defendant's SMF ¶ 86, which Gavrilovic disputes, *see* Plaintiff's Opposing SMF ¶ 86; Gavrilovic Dep. at 405-06, 409-12.

[61] Gavrilovic purports to deny this statement; however, her assertion that Ellingwood admitted originating the e-mail on the first page over his e-mail signature sheds no light on the question whether anyone else actually viewed them. *See* Plaintiff's Opposing SMF ¶ 87. Hence, she fails to controvert the underlying statement.

[62] My recitation incorporates, in part, Gavrilovic's qualification. *See* Plaintiff's Opposing SMF ¶ 91. She further qualifies this paragraph by asserting that there is no evidence of Costa's position on this proposed personnel realignment as of May 1, 2003, and only Costa made important company decisions of this kind. *See id.;* Remmey Dep. Exh. 8, Tab L to Vrountas Aff.; Ellingwood Dep. (*continued on next page*)

for Worldwide.  *Id*. ¶ 92.  Panjshiri eventually became Worldwide's regional director for the entire Southwest Asian theater.  *Id*. ¶ 93.

Worldwide expressed concern to Gavrilovic that someone had apparently gained access to what appeared to be confidential e-mails.  *Id*. ¶ 94.  According to Gavrilovic, Afzal, the purported sender of the alleged e-mails, was defensive and embarrassed that she had seen them.  *Id*.  Worldwide sent Gavrilovic an e-mail asking for her account of how she saw e-mails communicated between Afzal and Ellingwood.  *Id*. ¶ 95.  Worldwide informed Gavrilovic of an available position in Iraq following her removal from Bagram, but made clear that it would not offer her the position unless and until she provided an explanation of how she gained access to the purported e-mails.  *Id*. ¶ 96.  Gavrilovic refused to provide the requested explanation.  *Id*. ¶ 97.[63]

Worldwide duly reported the termination of Gavrilovic's placement in Bagram effective May 8, 2003 to DSS.  *Id*. ¶ 100.[64]  Worldwide did not communicate any derogatory information regarding the termination of Gavrilovic's placement in Afghanistan.  *Id*. ¶ 101.  There was nothing preventing Gavrilovic from reacquiring her security clearance if she was placed in another position.  *Id*. ¶ 102.[65]  Worldwide terminated her security clearance upon termination of her subcontract on or about May 9, 2003.  *Id*.[66]

Gavrilovic received the same starting salary as other site male managers deployed by Worldwide in theater.  Defendant's SMF ¶ 103; Affidavit of Larry Costa (Docket No. 37) ¶¶ 6-7.[67]

---

at 33.

[63] I omit the second sentence of paragraph 97, which Gavrilovic disputes.  *See* Plaintiff's Opposing SMF ¶ 97.

[64] Worldwide does not explain what "DSS" stands for.  I omit paragraphs 98 and 99, which Gavrilovic disputes.  *See* Plaintiff's Opposing SMF ¶¶ 98-99.  Gavrilovic qualifies paragraph 100, *see* Plaintiff's Opposing SMF ¶ 100, asserting that the government's security-clearance termination form states that termination of her security clearance was initiated by Worldwide on May 9, 2003, *see* Costa Dep. at 180-83, Costa Dep. Exh. 14, attached to Costa Dep.

[65] I omit Gavrilovic's statement that as a U.S. citizen, she could not have worked on a contract in Iraq without a security clearance, *see* Plaintiff's Additional SMF ¶ 133, which is unsupported by the citations given.

[66] I omit the balance of paragraph 102, which Gavrilovic disputes.  *See* Plaintiff's Opposing SMF ¶ 102.

[67] Gavrilovic purports to deny this statement, *see* Plaintiff's Opposing SMF ¶ 103; however, I sustain Worldwide's objection that her (*continued on next page*)

Worldwide paid Gavrilovic $5,375 a month, to start, as an assistant site manager in Bagram. Defendant's SMF ¶ 104; Gavrilovic Dep. at 269.  Worldwide gave her a rate increase to $6,125 per month after less than three months in theater.  Defendant's SMF ¶ 105; Plaintiff's Opposing SMF ¶ 105.

Before the end of the year 2003 Panjshiri became Worldwide's regional director of all southwest Asia operations.  *Id*. ¶ 106.  In addition, Worldwide's regional director for theater operations in Iraq through 2004 was a woman.  *Id*.  Three of the eight department heads in the Rumford home office are women.  *Id*.  There have been times when women have had even a greater role in the management of the company, with women heading the security, finance, travel and operations departments in Rumford.  *Id*.  Worldwide has women serving as department heads for departments covering security, finance, travel and purchasing.  *Id*.

The independent subcontractor agreement does not require Worldwide to pay Gavrilovic's medical bills.  *Id*. ¶ 107.[68]  Gavrilovic would have obtained the medical treatment in issue even if she believed that Worldwide never promised to pay for it.  *Id*. ¶ 109.[69]  Gavrilovic's direct medical expenses incurred at the United States military hospital in Landstuhl totaled $1,098.80.  Plaintiff's

---

denial is grounded on inadmissible hearsay (namely, her testimony regarding what Afzal and Bishop told her about their starting salaries).  *See* Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Defendant's S/J Reply") (Docket No. 51) at 3.  While Gavrilovic objects, in response to Worldwide's paragraph 104, that the Costa affidavit upon which Worldwide relies should be stricken because it is unsigned, *see* Plaintiff's Opposing SMF ¶ 104, she does not tender the same objection in response to paragraph 103, *see id*. ¶ 103.  Hence, she does not successfully controvert paragraph 103.

[68] Gavrilovic purports to qualify this statement, *see* Plaintiff's Opposing SMF ¶ 107, but her point is not well-taken and is on that basis disregarded.

[69] I omit paragraph 108, which Gavrilovic disputes.  *See* Defendant's SMF ¶ 108; Plaintiff's Opposing SMF ¶ 108.  Gavrilovic qualifies paragraph 109, *see* Plaintiff's Opposing SMF ¶ 109, stating that (i) her condition was serious enough that she would have had to have surgery with or without insurance, *see* Gavrilovic Dep. at 242-43, (ii) she insisted on obtaining a commitment directly from Costa that Worldwide would pay her medical bills and was not satisfied to have that representation from Remmey alone, *see id*. at 241-42, and (iii) Costa specifically authorized Worldwide's payment of her medical bills for her hospitalization and surgery in Landstuhl, Germany and related expenses, *see* Costa Dep. at 185-88.

Additional SMF ¶ 134; Costa Dep. Exh. 15, attached to Costa Dep.[70] Gavrilovic's medical bills have

not been paid.  Plaintiff's Additional SMF ¶ 135; Gavrilovic Dep. at 232-33.[71]

Gavrilovic identified essentially four types of conduct that resulted in her alleged severe

emotional distress.  Defendant's SMF ¶ 110; Plaintiff's Opposing SMF ¶ 110.  They are: (i) belittling

treatment by Costa and Afzal, (ii) harassment by Adams, (iii) the e-mail exchange between Worldwide

and the site managers in Bagram, and (iv) her termination of employment.  *Id*.  While Gavrilovic

testified that she was depressed, unfocused, unable to sleep, performed poorly in her daily life and

lost twenty pounds to bring her weight to 115 pounds, she also admitted that she did not need to seek

treatment from a doctor or receive medication.  Defendant's SMF ¶ 111; Plaintiff's Interrog. Ans. at

12-13, ¶ 13.[72]

### III.  Analysis

Gavrilovic alleges employment discrimination in violation of both Title VII of the Civil Rights

Act of 1964 as amended ("Title VII"), 42 U.S.C. § 2000e-5(c) (Count I), Complaint ¶¶ 32-40, and the

Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq*. (Count IV), *id*. ¶¶ 48-56, retaliatory

discharge in violation of Title VII (Count III), *id*. ¶¶ 43-47, defamation (Count VI), *id*. ¶¶ 59-66,

defamation *per se* – imputation affecting profession (Count VII), *id*. ¶¶ 67-75, defamation *per se* –

imputation of sexual misconduct (Count VIII), *id*. ¶¶ 76-84, invasion of privacy and false-light

---

[70] I have corrected an apparent typographical error in Gavrilovic's statement.  While she states that these expenses totaled $1,098.88, the underlying materials make clear that they totaled $1,098.80.  Worldwide both denies and objects to paragraph 134 on the basis that Gavrilovic herself testified she had not paid any of her medical expenses and thus she did not "incur" them.  *See* Defendant's Reply SMF ¶ 134; Gavrilovic Dep. at 231-33.  The objection is overruled.  I do not construe Gavrilovic to be stating that she personally paid the expenditures in question, but rather merely to be setting them forth.

[71] Worldwide purports to qualify this statement, *see* Defendant's Reply SMF ¶ 135; however, its qualification is more in the nature of a denial.  Inasmuch as I must view the cognizable evidence in the light most favorable to Gavrilovic as nonmovant, I disregard the purported qualification.

[72] Gavrilovic purports to deny this sentence, *see* Plaintiff's Opposing SMF ¶ 111; however, her assertion that she stated in her interrogatory answers that she knew the source of her anxiety and depression and did not need someone to tell her does not controvert the underlying statement.  I omit the second sentence of paragraph 111, which Gavrilovic disputes, and the third sentence, with respect to which I sustain her objection that it is conclusory and argumentative.  *See id*.

publicity (Count IX), *id*. ¶¶ 85-91, negligent infliction of emotional distress ("NIED") (Count X), *id*. ¶¶ 92-95, intentional infliction of emotional distress ("IIED") (Count XI), *id*. ¶¶ 96-99, and breach of contract (Count XIII), *id*. ¶¶ 102-14.  She also seeks punitive damages pursuant to Title VII and 42 U.S.C. § 1981 (Count II), *id*. ¶¶ 41-42, the MHRA (Count V), *id*. ¶¶ 57-58, and the common law (Count XII), *id*. ¶¶ 100-01.

Worldwide seeks summary judgment as to:

1.   Counts I-V on the basis that Gavrilovic was an independent contractor, not an employee.  *See* Defendant's S/J Motion at 3-8.

2.   Counts I-V on the basis that Gavrilovic failed to take advantage of preventive or corrective opportunities available to her, and Worldwide took reasonable steps to prevent and promptly correct alleged harassment.  *See id*. at 8-14.

3.   Count III on the basis that Worldwide did not retaliate against Gavrilovic for complaining of harassment.  *See id*. at 15-16.

4.   Counts I-V to the extent based on disparate treatment in pay and opportunities because there exists no evidence of discrimination in those areas.  *See id*. at 16.

5.   Counts VI-VIII on the bases that there is no evidence that anyone who received the BFT statement understood it in a defamatory sense and, in any event, it constitutes protected opinion.  *See id*. at 16-19.

6.   Count IX on the basis that the statement was not "publicized."  *See id*. at 19-20.

7.   Counts X and XI on the basis that there is no evidence that Gavrilovic suffered severe emotional distress as a result of Worldwide's conduct.  *See id*. at 20-22.

8.   Count X on the basis that Worldwide had no duty to Gavrilovic.  *See id*. at 22.

9.      Counts XI and XII on the basis that Worldwide's alleged actions were not intentional, extreme or outrageous.  *See id*. at 23-27.

10.      Count XIII on the basis that Worldwide did not breach the December Agreement.  *See id*. at 27-28.

For the reasons that follow, I recommend that the court grant summary judgment as to (i) Counts IX-XII and (ii) Counts I-V only to the extent based on disparate treatment in pay and opportunities, and that Worldwide's motion otherwise be denied.

## A. Employee v. Independent Contractor

I turn first to Worldwide's bid for summary judgment as to Counts I-V on the basis that Gavrilovic was an independent contractor.  The parties agree on this much: that (i) whether a person qualifies as an employee or an independent contractor for purposes of Title VII is a question of federal law, (ii) Maine courts look to Title VII caselaw in construing the MHRA, and (iii) for purposes of both Title VII and the MHRA, Gavrilovic must demonstrate that she was an employee rather than an independent contractor to be entitled to relief.  *See id*. at 3-4 & n.2; Plaintiff's Opposition to Defendant's Motion for Summary Judgment, etc. ("Plaintiff's S/J Opposition") (Docket No. 45) at 3.

Worldwide argues that the December Agreement, which Gavrilovic admittedly signed and has testified governed the terms of her relationship with Worldwide, makes clear that she was a subcontractor and is dispositive of the issue for purposes of Title VII and the MHRA.  *See* Defendant's S/J Motion at 4-5.  Alternatively, it contends that Gavrilovic readily can be perceived to have been an independent contractor when viewed through the lens of the so-called "common law agency test." *See id*. at 5-8.  Gavrilovic rejoins – correctly – that pursuant to the controlling common-law agency test, a contract such as the December Agreement is not examined in isolation; rather, the existence of such a document is one of several factors relevant to analysis.  *See* Plaintiff's S/J

Opposition at 6-7; *Alberty-Vélez v. Corporación de Puerto Rico para la Difusión Pública*, 361 F.3d

1, 6-7 (1st Cir. 2004).  As the First Circuit has explained:

> Under the common law test, a court must consider the hiring party's right to control the manner and means by which the product is accomplished.  Among other factors relevant to this inquiry are the skills required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.
>
> The test provides no shorthand formula or magic phrase that can be applied to find the answer, . . . all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.  However, in most situations, the extent to which the hiring party controls the manner and means by which the worker completes her tasks will be the most important factor in the analysis.

*Alberty-Vélez*, 361 F.3d at 7 (citations and internal punctuation omitted).  As the Law Court has

observed in the context of explicating its similar test, "The right to control the 'details of the

performance,' present in the context of an employment relationship, must be distinguished from the

right to control the result to be obtained, usually found in independent contractor relationships."

*Legassie v. Bangor Publ'g Co.*, 741 A.2d 442, 444 (Me. 1999).

Summary judgment in favor of a defendant on this issue is appropriate if "it is clear, based on

the parties' entire relationship, that a reasonable fact finder could only conclude that [the plaintiff]

was an independent contractor."  *Alberty-Vélez*, 361 F.3d  at 10-11.  The cognizable evidence,

construed in the light most favorable to Gavrilovic, does not make clear that a reasonable fact finder

could only decide in favor of Worldwide on this point.  Several factors do indeed weigh in its favor:

(i) it was not the source of the majority of instrumentalities and tools used on the job (most of which

were provided by the United States military), (ii) per the December Agreement, Gavrilovic did not

receive employee benefits, (iii)  per the December Agreement, she was treated as an independent

25

contractor for tax purposes, (iv) per the December Agreement, she was paid every thirty days while, by contrast, per Maine law employees must be paid at least every sixteen days, *see* 26 M.R.S.A. § 621-A(1), and (iv) the December Agreement had a one-year term (from December 1, 2002 to November 30, 2003).

Nonetheless, one viewing the evidence in the light most favorable to Gavrilovic could discern several factors collectively weighing heavily in her favor: (i) rather than being hired for her special skills, as she was in her prior role as linguist, she was essentially hired to work in Afghanistan as a junior manager, on the bottom rung of a chain of command extending from herself and her colleague Bishop to Afzal and then to Adams, and she received some training in how to perform that job prior to departing for Afghanistan, (ii) the work she did was an integral part of the business of Worldwide: the provision of linguists to clients, including the United States military, (iii) Worldwide had made a longstanding practice of treating its Rumford-based managers as "employees" and its on-site managers (in places such as Kosovo, Uzbekistan and Afghanistan) as "independent contractors" – a distinction seemingly driven largely, if not entirely, by physical location and marginally, if at all, by job responsibilities, (iv) Worldwide provided some of the tools and instrumentalities of Gavrilovic's job, including certain clothing it deemed appropriate for the harsh weather in Afghanistan, a laptop and a matrix (form) to be used by on-site managers, (v) Gavrilovic provided no tools or instrumentalities for her work, apart from outerwear that she deemed appropriate for Afghanistan but Worldwide did not, (vi) when the Bagram site was short-staffed, Gavrilovic took on additional duties, and (vii) while Gavrilovic received linguist assignments and instructions from the military, she also interacted with the Rumford home office on a daily basis, sending required reports in a prescribed format, seeking

direction on innumerable questions related to the roster of linguists and receiving and carrying out instructions from Rumford on issues such as linguist pay, expenses and security.[73]

In short, a reasonable trier of fact, viewing the evidence in the light most favorable to Gavrilovic, could conclude that Worldwide exercised significant control (albeit from a great distance) over her work product and the manner in which her duties were performed. *Compare, e.g., Alberty-Vélez*, 361 F.3d at 7-9 (several factors weighed in favor of classifying plaintiff television actress as independent contractor of television station, including fact that actress position was skilled position requiring talent and training not available on job; plaintiff provided tools, instrumentalities to perform work; television station could assign no work other than that specifically identified in contract; plaintiff was paid a lump sum per episode and only for episodes actually filmed; station provided no benefits; and both parties treated plaintiff for tax purposes as independent contractor). Worldwide accordingly falls short of demonstrating its entitlement to summary judgment on this basis with respect to Counts I-V.

## B. *Faragher/Ellerth* Defense

Worldwide next alternatively invokes the so-called *Faragher/Ellerth* defense as a basis for summary judgment with respect to Counts I-V. *See* Defendant's S/J Motion at 9 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

"As a general rule, an employer is vicariously liable for an actionable hostile work environment created by a supervisor." *Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 20 (1st Cir. 2002). Nonetheless, in cases in which no "tangible employment action" has been taken, an employer

---

[73] The weight of the fact that the December Agreement repeatedly referred to Gavrilovic as a "subcontractor" is lessened by Gavrilovic's evidence that (i) Worldwide lacked a form of employment (versus independent contractor) agreement, and (ii) the agreement erroneously described Gavrilovic's job as a linguist when in fact she was to work as an assistant site manager.

may yet escape such vicarious liability by means of the *Faragher/Ellerth* affirmative defense.  *See id.*

at 20-21 & n.3.  As the First Circuit has clarified:

> The *Faragher/Ellerth* affirmative defense has two necessary elements, and the
> employer bears the burden of proof as to both.  First, the employer must show that it
> exercised reasonable care to prevent and correct promptly any sexually harassing
> behavior.  That requirement typically is addressed by proof that the employer had
> promulgated an anti-harassment policy with a complaint procedure.  Second, the
> employer must establish that the plaintiff employee unreasonably failed to take
> advantage of any preventive or corrective opportunities provided by the employer or
> to avoid harm otherwise.  That prong is usually addressed by proof that the plaintiff
> unreasonably ignored an established complaint procedure.

*Id.* at 20-21 (citations, footnote and internal punctuation omitted).

Worldwide posits that inasmuch as Gavrilovic (i) knew how to complain to Worldwide about

alleged sexual harassment, (ii) knew from her own past experience that Worldwide would take swift

action to prevent and correct such behavior, (iii) contacted Worldwide regularly during her time in

Afghanistan but (iv) never complained to Worldwide about Adams' alleged sexual harassment until

May 2003, after she already was slated to leave Afghanistan, it meets both prongs of the defense.  *See*

Defendant's S/J Motion at 9-10.  I agree with Gavrilovic, *see* Plaintiff's S/J Opposition at 11-16, that

she raises triable issues as to both prongs.

Turning to the first prong, Worldwide asserts that its handling of Edelman's complaint about

Adams and Gavrilovic's complaint about Todorovski underscores the reasonableness of its response

to complaints of sexual harassment.  *See* Defendant's S/J Motion at 11, 13-14.  It contends that it

cannot be faulted for any dereliction of duty with respect to Gavrilovic's complaints about Adams (or,

worse, be accused of retaliating against her for making such complaints) because it was completely

unaware of them until after it decided to withdraw her from Afghanistan.  *See id.* at 10.

Worldwide adduces no evidence that it had in place an anti-harassment policy with a

complaint procedure – the type of evidence that the First Circuit has stated "typically" discharges an

employer's burden of proof as to the first *Faragher/Ellerth* prong.  *See Marrero*, 304 F.3d at 20.  Nor is there any evidence that Worldwide instituted any sort of companywide training designed to *prevent* the occurrence of sexual harassment, as opposed to simply responding to such complaints in an *ad hoc* fashion.  As Worldwide points out, the absence of an anti-harassment policy is not, in itself, fatal to invocation of the *Faragher/Ellerth* defense.  *See* Defendant's S/J Motion at 9; *Ellerth*, 524 U.S. at 765.  However, a failure to institute any preventive measures whatsoever arguably is a default greater in magnitude than the absence of a stated policy.  Nonetheless, even assuming *arguendo* that an employer in such a position could succeed on the first prong of the defense, Gavrilovic raises material issues whether Worldwide's response to her complaints concerning Todorovski and Adams suffices under *Faragher/Ellerth*.

Gavrilovic says she complained to both Williamson and (eventually) Remmey about Todorovski's conduct.  Per her version of events, Williamson did nothing upon being informed of her complaints apart from handing her a business card inscribed with a cryptic (and arguably demeaning) saying, and Remmey was not sent to Kosovo in part for the purpose of addressing her complaints, as Worldwide contends, but rather learned about them after his arrival.  With respect to Adams, Gavrilovic asserts that Remmey informed Costa of her sexual-harassment complaint on May 8, 2003.  On the same day, Costa (via Williamson) ordered Gavrilovic back to the United States.  On Gavrilovic's version of events, a trier of fact reasonably could infer that while Costa was anxious to know how she gained access to the e-mails Remmey had retrieved, he and Worldwide evinced no apparent concern about the reported sexual harassment by Adams, about which they did nothing.

In short, the facts adduced by Gavrilovic, which I must credit for purposes of summary judgment, do not paint a picture of an employer who exercised reasonable care to prevent and correct promptly any harassing behavior.  Inasmuch as an employer bears the burden of proving both prongs of

the *Faragher/Ellerth* defense, Gavrilovic's success in raising genuine issues of material fact as to the first prong dooms Worldwide's bid for summary judgment on this basis. Nonetheless, I note that with respect to the second prong, as well, Worldwide falls short of making a persuasive case on the facts viewed in the light most favorable to Gavrilovic. Worldwide points to no established procedure that Gavrilovic was obliged or encouraged to follow to lodge a sexual-harassment complaint. It posits that Gavrilovic knew full well how to lodge a complaint that would be swiftly and effectively addressed because she had done so in regard to Todorovski, and that she unreasonably failed to do so with respect to Adams. *See* Defendant's S/J Motion at 10-11. Nonetheless, accepting Gavrilovic's version of events, she had reason to believe (based on Costa's own comments disparaging of women in the workplace and the handling of her Todorovski complaint) that Worldwide generally was unreceptive to such complaints and that Remmey was the only Worldwide senior manager who would take them seriously and deal with them effectively. She elected, because of asserted privacy concerns regarding use of telephone and e-mail, to wait to tell Remmey until she could do so face-to-face. Worldwide contends that the asserted privacy concerns were unreasonable, pointing out, for example, that for periods of time Gavrilovic was the only Worldwide employee in Bagram. *See id.* at 11. Yet, in the circumstances as portrayed by Gavrilovic – including Worldwide's lack of any official procedure for lodging sexual-harassment complaints, Costa's troubling remarks about women in the workplace and the lack of responsiveness to the Todorovski complaint until Remmey appeared on the scene – Gavrilovic's choice to wait to lodge her complaint until she could do so in a face-to-face meeting with Remmey cannot be said to have represented an "unreasonable" failure to take advantage of corrective opportunities provided by the employer.

Worldwide accordingly falls short of demonstrating its entitlement to summary judgment as to Counts I-V on the basis of the *Faragher/Ellerth* defense.

## C.  Retaliation Claim

To sustain a claim of retaliation, a plaintiff must adduce evidence that: "(1) [she] engaged in protected conduct under Title VII; (2) [she] experienced an adverse employment action; and (3) a causal connection exists between the protected conduct and the adverse action." *Gu v. Boston Police Dep't*, 312 F.3d 6, 14-15 (1st Cir. 2002).  Worldwide asserts that Gavrilovic's claim founders on the third prong inasmuch as the decision to remove her from Afghanistan predated her complaints about either (i) sexual harassment by Adams or (ii) the allegedly defamatory e-mail exchange.  *See* Defendant's S/J Motion at 15-16.  This is so, Worldwide posits, inasmuch as the e-mail exchange, which occurred between April 29 and May 1, 2003, demonstrates that the decision to remove Gavrilovic from Afghanistan had already been made as of that time.  *See id.*

Nonetheless, Gavrilovic adduces evidence that (i) prior to May 8, 2003 she had performed her work in Afghanistan satisfactorily and no one, apart from Afzal, had criticized that work, (ii) only Costa had authority to make a final decision concerning termination of an employee's (or contractor's) work with Worldwide, and (iii) his decision to terminate Gavrilovic's contract was made no sooner than May 8, 2003, when, through Williamson, he ordered Gavrilovic back to the United States.  This decision postdated her complaints about the e-mails; further, a trier of fact crediting Gavrilovic's version of events could infer that it postdated her complaint about Adams' sexual harassment in that, per Gavrilovic, Remmey informed Costa of that complaint the same day (May 8, 2003).

Thus, Worldwide falls short of demonstrating entitlement to summary judgment with respect to Gavrilovic's retaliation claim.

## D.  Disparate Treatment in Pay, Opportunities

Worldwide next seeks summary judgment as to Counts I-V of Gavrilovic's complaint to the extent they are predicated on a claim of disparate treatment in pay and opportunities on the basis of

31

lack of evidence.  *See* Defendant's S/J Motion at 16.  I agree that she has failed to produce admissible evidence to sustain such a claim.  Gavrilovic attempted to adduce evidence that she received less pay than her male counterparts, *see* Plaintiff's S/J Opposition at 20; Plaintiff's Opposing SMF ¶¶ 103-04; however, I sustained Worldwide's hearsay objection to those assertions, *see* Defendant's S/J Reply at 3.  Worldwide accordingly is entitled to summary judgment with respect to Counts I-V to the extent they claim disparate treatment in pay or opportunities.

### E.  Defamation Claims

Worldwide next targets Gavrilovic's defamation claims (Counts VI-VIII), with respect to which it seeks summary judgment on the alternative bases that (i) she failed to adduce evidence that any recipient of the e-mail exchange understood it in a defamatory sense and, (ii) in any event, the offending statement constituted protected opinion.  *See* Defendant's S/J Motion at 16-19.  I conclude that Worldwide falls short of demonstrating its entitlement to summary judgment on either ground.

1.   Burden of Proof: Recipients' Understanding

Worldwide first contends that (i) Gavrilovic, as plaintiff, bore the burden of establishing that recipients of the  BFT e-mail actually understood it in a defamatory sense, and (ii) because she adduced no such evidence, Worldwide is entitled to summary judgment with respect to her defamation claims.  *See id*. at 16-17.  For this proposition Worldwide cites *Featherson v. Davric Corp*., Civil No. 98-41-P-H (D. Me. Sept. 23, 1998), in which this court observed: "The question to be determined is whether the communication is reasonably understood in a defamatory sense by the recipient. . . .  It is not enough that the language used is reasonably capable of a defamatory interpretation if the recipient did not in fact so understand it."  *Id*. (quoting *Featherson*, slip op. at 3).

While it is true, as a general proposition, that the plaintiff bears the burden of establishing the defamatory nature of a communication, *see, e.g., Schoff v. York County*, 761 A.2d 869, 871 (Me.

2000) (plaintiff must establish, *inter alia*, that defendant "made a false and defamatory statement concerning her"), *Featherson* did not hold that a plaintiff bears the burden in all circumstances of proving how a communication actually was understood by the recipient(s), *see Featherson*, slip op. at 2-5. The burden-of-proof issue is more nuanced than Worldwide appreciates.

The Restatement (Second) of Torts provides, in relevant part: "[T]he plaintiff has the burden of proving, when the issue is properly raised, (a) the defamatory character of the communication, . . . [and] (d) the recipient's understanding of its defamatory meaning[.]" Restatement (Second) of Torts § 613(1) (1977). However, commentary to section 613 clarifies:

> If the communication is ambiguous, capable either of a meaning that is defamatory or one that is innocent, the plaintiff has the burden of proving that it was reasonably understood in the sense that would make it defamatory. So too, the plaintiff has the burden of proving that the meaning that the communication is found to have conveyed to the recipient is defamatory in character . . . . To satisfy this burden, the plaintiff must first convince the court that the communication is capable of the defamatory meaning ascribed to it, and he must then convince the jury that the communication was understood in this defamatory sense. Thus, when the defamatory character of the communication depends upon extrinsic circumstances, the plaintiff must prove both their existence and knowledge of them by the recipient of the communication.

> When, however, the plaintiff proves the publication of language that is defamatory on its face, the burden is on the defendant to come forward with evidence to make it doubtful that the recipient so understood it.

*Id.* cmt. c*; see also, e.g., Sunward Corp. v. Dun & Bradstreet, Inc.*, 811 F.2d 511, 519 n.7 (10th Cir. 1987) ("Technically, the requirement that a declaration must be understood in a defamatory sense applies to all defamation cases and includes both libel per se and libel per quod. For practical purposes, however, the issue does not often arise in libel per se cases. For example, where there is a false report of bankruptcy it is obviously unnecessary to prove that the recipient of the report knows the meaning of the word.").[74]

---

[74] Expressions that are libelous *per quod* "require that their injurious character or effect be established by allegation and proof. They are those expressions which are not actionable upon their face, but which become so by reason of the peculiar situation or occasion (*continued on next page*)

Gavrilovic, in essence, alleged in her amended complaint that the BFT e-mail was defamatory on its face. *See* Complaint ¶¶ 67-84. In that circumstance, as discussed above, Worldwide rather than Gavrilovic would bear the burden of proof regarding the manner in which recipients of the e-mail actually understood it. Yet Worldwide, in seeking summary judgment, simply assumed (without discussion) that Gavrilovic would retain the burden of proving the manner in which the communication actually was understood. *See* Defendant's S/J Motion at 16-17. In the absence of any reasoned analysis of the question whether the BFT e-mail is defamatory on its face, Worldwide cannot make a persuasive case for summary judgment on the basis of lack of evidence that, at least arguably, it bore the burden to provide.[75]

What is more, in weighing whether a communication is susceptible of a defamatory meaning, a court is directed to "take into account all the circumstances surrounding the communication of the matter complained of as defamatory." Restatement (Second) of Torts § 614 cmt. d; *see also, e.g., Schoff*, 761 A.2d at 871 n.3 ("In determining whether a statement is defamatory, the statement must be interpreted in its context, which includes the entire publication and all extrinsic circumstances known to the recipient."). Worldwide did not see fit, in its statement of material facts, to quote the entire e-mail exchange (or even the solitary e-mail) in which the allegedly defamatory comment appeared. *See generally* Defendant's SMF. Unfortunately for Worldwide, Gavrilovic chose not to do so, either.

---

upon which the words are written." Black's Law Dictionary 916 (6th ed. 1990). "To render words 'libelous per se,' the words must be of such character that a presumption of law will arise therefrom that the plaintiff has been degraded in the estimation of his friends or of the public or has suffered some other loss either in his property, character, reputation, or business or in his domestic or social relations." *Id.*

[75] In *Featherson*, by contrast, the plaintiff argued that the statements in issue "could reasonably be interpreted" as defamatory. *See Featherson*, slip op. at 2. In addition, on summary judgment, the defendant introduced uncontroverted evidence that everyone who heard the statements treated them as jests. *See id.* at 4. Because the statements in issue were ambiguous and/or because the defendant had come forward with evidence that they had been understood as jests, the plaintiff bore the burden of producing evidence of the recipients' understanding. *See id.* at 5 ("If there were some previously unknown third party who had interpreted the statements as the plaintiff would have them interpreted, that party or parties should have been identified by the plaintiff by now. Without a third party treating the statements as defamatory, the plaintiff may have other causes of action, but she does not have a claim for defamation.").

*See generally* Plaintiff's Additional SMF.  Thus, to the extent Worldwide means to suggest that the court should rule as a matter of law that the BFT comment is ambiguous (thereby leaving Gavrilovic with the burden of proving the manner in which the comment actually was understood), it fails to supply the court not only with reasoned argumentation but also with sufficient cognizable evidence on which to base such a ruling.  It accordingly falls short of demonstrating its entitlement to summary judgment with respect to Gavrilovic's defamation claims on the basis of a lack of evidence concerning the manner in which recipients of the e-mail understood it.

2.     Fact v. Opinion

Worldwide alternatively seeks summary judgment with respect to Gavrilovic's defamation claims on the basis that the BFT comment constitutes protected opinion.  *See* Defendant's S/J Motion at 17-19.  This gambit falls short for two reasons: (i) as discussed above, Worldwide fails to provide sufficient context for assessment of the statement, and (ii) based on the cognizable evidence, a reasonable fact-finder could conclude that the asserted opinion implies the existence of defamatory facts.

In Maine, "[a] defamation claim requires a statement – i.e. an assertion of fact, either explicit or implied, and not merely an opinion, provided the opinion does not imply the existence of undisclosed defamatory facts."  *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991).  As the Law Court has observed, in accordance with the so-called *Caron* test (a reference to *Caron v. Bangor Publ'g Co.*, 470 A.2d 782, 784 (Me. 1984)):

> Although Maine's common law of defamation does not allow recovery for statements of opinion alone, deciding whether a statement expresses a "fact" or "opinion" is not always an easy task.  Our standard looks to the totality of the circumstances: A comment is an opinion if it is clear from the surrounding circumstances that the maker of the statement did not intend to state an objective fact but intended rather to make a personal observation of the facts.

*Id*. at 71 (citations and internal punctuation omitted); *see also, e.g., McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) ("[C]ourts have developed the doctrine of constitutionally protected opinion into an examination of the 'totality of the circumstances' surrounding an alleged defamation. While the cases refer liberally to the opinion/fact distinction, courts recognize that these categories are only a guide. Depending upon the context, a statement of fact may be protected while a statement of opinion may not.") (citations omitted).

Worldwide, as the proponent of summary judgment, bore the burden of enlightening the court as to the totality of relevant circumstances in this case. As noted above, it did not see fit to quote in its statement of material facts the string of e-mails, or even the single e-mail, in which the offending comment appears. Given that the comment was part of a writing, the verbiage of the e-mail in which it appears is critical to understanding its context. The absence of this evidence, in itself, is sufficient reason to rule against Worldwide on this point.

In any event, on the basis of the cognizable evidence, Gavrilovic has the better of the argument on the merits. The parties expend considerable energy arguing whether, with regard to private parties and private matters, Maine follows the so-called *Milkovich* standard, pursuant to which statements are protected as opinion unless provably false. *Compare* Defendant's S/J Motion at 18, Defendant's S/J Reply at 5 *with* Plaintiff's S/J Opposition at 26-28; *see also Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19-20 (1990).

This is something of a tempest in a teapot inasmuch as the Law Court has made clear that the *Caron* standard "comports with" the test articulated in the *Milkovich* decision. *See Powers*, 596 A.2d at 71 n.9. The *Caron* standard, in turn, clearly applies in situations involving private parties and private matters. *See, e.g., Haworth v. Feigon*, 623 A.2d 150, 156 (Me. 1993) (lower court had properly ruled, in accordance with *Caron* standard, that there was jury question whether homeowners'

36

statement to prospective tenant regarding general contractor, "I hear you hired the drunk," constituted fact versus opinion).  Thus, the *Milkovich* standard is, at the least, instructive on the question whether, pursuant to Maine law, the BFT comment constitutes protected opinion.  *See, e.g., Levinksy's, Inc. v Wal-Mart Stores, Inc*., 127 F.3d 122, 127 n.2 (1st Cir. 1997) ("Restatement [(Second) of Torts] § 566 seemingly applies the *Milkovich* standard to defamation actions regardless of whether the challenged statements address issues of public or private concern.  This formulation accurately reflects Maine's defamation law.")

In deciding whether a defamation defendant is entitled to summary judgment on the basis that the statement in issue constitutes protected opinion, a court must assess whether the "statement could reasonably be understood by the ordinary person as implying undisclosed defamatory facts[.]"  *Staples v. Bangor Hydro-Elec. Co*., 629 A.2d 601, 603 (Me. 1993) (citations and internal quotation marks omitted).  If so, summary judgment is inappropriate; "the question of whether it is a statement of fact or an opinion will be submitted to the jury."  *Id*. (citations and internal quotation marks omitted).[76]  I have little difficulty concluding that, on the cognizable evidence, Worldwide falls short of showing as a matter of law that the offending statement constituted protected opinion.  The evidence viewed in the light most favorable to Gavrilovic paints the following picture:

1.      At the time of the sending of the e-mails Gavrilovic was an assistant site manager for Worldwide in Bagram, Afghanistan, where Afzal was her immediate supervisor and Adams was Afzal's immediate supervisor.  Ellingwood was a Worldwide manager in the Rumford, Maine home office.  Gavrilovic was the sole female Worldwide employee in Bagram.

---

[76] Worldwide relies, in part, on Gavrilovic's admission that the phrase BFT is not capable of objective verification.  *See* Defendant's S/J Reply at 6.  Nonetheless, "[t]he determination whether an allegedly defamatory statement is a statement of fact or opinion is a question of law" for the court to decide.  *Ballard v. Wagner*, 877 A.2d 1083, 1087 (Me. 2005) (citation and internal quotation marks omitted).  Gavrilovic's opinion hence is irrelevant.

2.      Gavrilovic had been doing a good job as assistant manager; in fact, she had been entrusted to run Worldwide's Bagram operation by herself for a period of ten to fourteen days.

3.      Adams had sexually harassed Gavrilovic in December 2002 and January 2003, engaging in such behaviors as  regularly grabbing at her thighs and buttocks in the Worldwide workplace.

4.      While stationed in Bagram, Gavrilovic had a monogamous sexual relationship with a United States Army sergeant.

5.      Afzal sent an e-mail that was received, at the least, by Ellingwood, concerning the replacement (unbeknownst to Gavrilovic) of Gavrilovic by another woman, Freshta Panjshiri.

6.      In that e-mail, he referred to Gavrilovic as the BFT.

I find no definition of the phrase "fuck toy" in the Oxford English Dictionary Online. However, the noun "fuck" is defined, *inter alia*, as "[a]n act of copulation" and "[a] person (usu. a woman) considered in sexual terms[.]"      *See*  http://dictionary.oed.com/cgi/entry/ 50090565?query_type=word&queryword=fuck&first=1&max_to_show=10&sort_type=alpha&result _place=1&search_id=NQrw-fM9Ven-1125&hilite=50090565.   A draft addition also would define the noun "fuck" as "[a] person who (habitually) makes a mess of things; an incompetent person, a blunderer, a maladjusted person, a misfit."  *See id.*

The noun "toy" is defined, *inter alia*, as "[a]morous sport, dallying, toying[,]" "[a] sportive or frisky movement; a piece of fun, amusement, or entertainment; a fantastic act or practice; an antic a trick[,]" "[a] thing of little or no value or importance, a trifle; a foolish or senseless affair, a piece of nonsense; *pl.* trumpery, rubbish[,]"  and a "plaything[.]"   *See*  http://dictionary.oed.com/cgi/entry/ 50255514?query_type=word&queryword=toy&first=1&max_to_show=10&sort_type=alpha&result _place=1&search_id=NQrw-Tr0pOM-1364&hilite=50255514.

38

I agree with Gavrilovic that, in this context, the phrase BFT is reasonably capable of being construed as something more than a mere offensive vulgarism. *See* Plaintiff's S/J Opposition at 25; *compare, e.g., Allen v. Echostar Commc'ns Corp.*, No. CV-04-0017-JLQ, 2005 WL 1123753, at *3 (E.D. Wash. May 11, 2005) (phrase "stupid bitch" was "an offensive vulgarism" that constituted a non-actionable statement of opinion). Specifically, the phrase in question reasonably can be construed as a reference to Gavrilovic's sexual conduct and character while in Bagram, precluding summary judgment in Worldwide's favor. *See id.*

The words "fuck" and "toy," together, reasonably could be understood by an ordinary person as connoting a sexual plaything, both on their face and when viewed in the light of Gavrilovic's particular circumstances. Gavrilovic was the only female Worldwide employee in Bagram. She had been subjected to unwanted sexual attention from Adams, and a trier of fact reasonably could infer that Afzal and other Bagram staff were aware of this conduct, which included grabbing at Gavrilovic's thighs and buttocks in the workplace. Afzal, her immediate supervisor, apparently did not think much of her as an employee and contemplated replacing her with Panjshiri. His choice of words implies the existence of at least one defamatory fact: that Gavrilovic was sexually promiscuous. *See, e.g., Stanton v. Metro Corp.*, 357 F. Supp.2d 369, 377-78 (D. Mass. 2005) ("Statements falsely suggesting that a person is sexually promiscuous or sexually licentious are generally actionable as defamation. Even in today's environment, such activities would hold the plaintiff up to contempt, hatred, scorn, or ridicule or tend to impair her standing in the community, at least to her discredit in the minds of a considerable and respectable class in the community.") (citations and internal punctuation omitted) (applying Massachusetts law); *Ward v. Klein*, No. 100231-05, 2005 WL 2997758, at *3 (N.Y. Sup. Ct. Nov. 9, 2005) ("The Court recognizes defendants' argument that changing social mores could affect how certain sexual conduct is viewed by the community, and that what was defamatory *per se* at

39

one time may no longer be the case.  Although consensual sexual relations between unmarried persons are certainly viewed differently than they once were, defendants do not cite to any legal authority or social science data to support their argument that allegations of unchastity, when combined with claims of promiscuity and casual sexual encounters such as those here, can no longer support a finding of defamation *per se*.  The Court has found no case in this State, or elsewhere, that stands for so broad a proposition, and absent appellate authority, this Court is constrained from reaching the conclusion urged by defendants.") (citation omitted) (applying New York law).

Further, even under the *Milkovich* test, whether Gavrilovic was a BFT – sexually promiscuous while in Bagram – is capable of objective verification.  *See, e.g., Levinsky's*, 127 F.3d at 127 n.3 ("The *Milkovich* Court explained: 'If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth,' and the comment can be actionable.  By contrast, if the speaker says, 'In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin,' the First Amendment bars recovery because the statement cannot be objectively verified.") (citations omitted); *compare, e.g., Fortier v. International Bhd. of Elec. Workers, Local 2327*, 605 A.2d 79, 80 (Me. 1992) (trial court correctly concluded as matter of law that statement were not defamatory when, "[b]ased on the only reasonable interpretation, the flyer accuses Fortier of having no morals because he crossed the picket line and characterizes that conduct as a betrayal of Fortier's fellow workers.  The reader is free to evaluate that characterization on the basis of disclosed facts that are admittedly correct.").

As an aside,  Worldwide argues that to the extent Afzal's statement can be said to refer to Gavrilovic's sexual activity in Afghanistan, it is not actionable because it is true: She admitted that while in Bagram she had a monogamous relationship with a man.  *See* Defendant's S/J Motion at 19

n.6.  However, a monogamous relationship is a far cry from the type of sexual licentiousness implied by the BFT comment.

For these reasons, Worldwide falls short of demonstrating entitlement to summary judgment with respect to Gavrilovic's defamation claims (Counts VI-VIII).

### F.  False-Light Publicity

Worldwide seeks summary judgment as to Gavrilovic's claim of false-light publicity (Count IX) on the basis that there is no evidence that the BFT statement was widely publicized, as is required to sustain such a cause of action.  *See id.* at 19-20.  Gavrilovic articulates no response to this assertion, *see generally* Plaintiff's S/J Opposition, seemingly conceding the point, *see, e.g., Grenier v. Cyanamid Plastics, Inc*., 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") (citations and internal quotation marks omitted).

In any event, Worldwide is correct on the merits.  Under Maine law, a claim of false-light publicity arises "if (a) the false light in which the other [person] was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  *Cole v. Chandler*, 752 A.2d 1189, 1197 (Me. 2000) (citation and internal quotation marks omitted).  In the false-light context, "'[p]ublicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."  *Id*. (citation and internal quotation mark omitted).  As Worldwide points out, *see* Defendant's S/J Motion at 20, construing the evidence in the light most favorable to Gavrilovic, the objectionable e-mail was published, at most, to only four individuals.  This is insufficient to sustain the cause of action.  *See, e.g., Lovings v. Thomas*, 805 N.E.2d 442, 446 (Ind. Ct.

App. 2004) (communication to security officer not enough); *Chandler*, 752 A.2d at 1192, 1197 (communication to manager, investigator not enough); *Rush v. Maine Sav. Bank*, 387 A.2d 1127, 1128 (Me. 1978) ("public disclosure" a "necessary element" of false-light privacy invasion); Restatement (Second) of Torts § 652D cmt. a ("[I]t is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.").

Worldwide is accordingly entitled to summary judgment with respect to Count IX, the false-light claim.

### G.  NIED Claim

Worldwide requests summary judgment as to Gavrilovic's NIED claim (Count X) on two alternative bases: that she falls short of demonstrating either (i) the requisite severe emotional distress or (ii) the existence of a duty to avoid causing her emotional harm.  *See* Defendant's S/J Motion at 20-22.  Inasmuch as Maine has not yet recognized such a duty in the employer-employee context, I agree that Worldwide is entitled to summary judgment with respect to this count on that ground.[77]

To make out a claim for NIED, "a plaintiff must set forth facts from which it could be concluded that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was harmed; and (4) the breach caused the plaintiff's harm."  *Curtis v. Porter*, 784 A.2d 18, 25 (Me. 2001).  The Law Court has "recognized a duty to act reasonably to avoid emotional harm to others in very limited circumstances: first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed."  *Id*. (footnotes omitted).[78]  It has cautioned: "Plaintiffs claiming negligent

---

[77] Because of my recommended disposition, I need not and do not reach Worldwide's alternative argument that Gavrilovic fails to set forth sufficient evidence that she suffered severe emotional distress.

[78] The Law Court has "also held that a claim for [NIED] may lie when the wrongdoer has committed another tort.  However, as we (*continued on next page*)

infliction . . . face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability." *Id.* (footnote omitted).

Mindful of these limitations, the First Circuit reversed a judgment in favor of two plaintiffs on a NIED claim asserted pursuant to Maine law, observing:

> The Maine Law Court has proceeded cautiously in determining the scope of a defendant's duty to avoid inflicting emotional distress. That court recently stated: 'Only where a particular duty based upon the unique relationship of the parties has been established may a defendant be held responsible, absent some other wrongdoing, for harming the emotional well-being of another.' Hence, we are reluctant to expand this relatively undeveloped doctrine beyond the narrow categories addressed thus far. The relationship between a journalist and a potential subject bears little resemblance to those the Law Court permitted to recover in the above-cited cases. Moreover, the First Amendment might arguably make it less appropriate to find such a relationship, although we make no ruling in this regard.

*Veilleux v. National Broad. Co.*, 206 F.3d 92, 131 (1st Cir. 2000) (citations omitted).

My research reveals no case in which the Law Court has recognized a duty extending from an employer to an employee for purposes of NIED, and Gavrilovic points to none. *See* Plaintiff's S/J Opposition at 30-31. Nonetheless, Gavrilovic asserts that (i) the duty to maintain a harassment-free workplace arises from both Title VII and the MHRA, and (ii) this court, in *Watkins v. J & S Oil Co.*, 977 F. Supp. 520 (D. Me. 1997), *aff'd*, 164 F.3d 55 (1st Cir. 1998), and *Duplessis v. Training & Dev. Corp.*, 835 F. Supp. 671 (D. Me. 1993), "acknowledged that a plaintiff may recover against an employer for negligent infliction of emotional distress related to harassment in the workplace." *Id.* at 30-31 & n.1.

I find no Law Court case inferring a duty, for purposes of NIED, from the existence of a statute. Nor do I construe either *Watkins* or *Duplessis* as recognizing the existence of the cause of action in

---

have recently held, when the separate tort at issue allows a plaintiff to recover for emotional suffering, the claim for [NIED] is usually subsumed in any award entered on the separate tort." *Curtis*, 784 A.2d at 26.

question.  From all that appears, in neither case was the court called upon to rule whether, for purposes of a claim of NIED in Maine, an employer-employee relationship constitutes a "unique relationship."  *Veilleux*, 206 F.3d at 131; *see also Watkins*, 977 F. Supp. at 527; *Duplessis*, 835 F. Supp. at 683.  In *Watkins*, the court held the defendant employer entitled to summary judgment with respect to its former employee's NIED claim on the basis that, even assuming *arguendo* the employer had been negligent, the employee failed to establish the requisite factual predicate for a finding of "severe" emotional distress.  *See Watkins*, 977 F. Supp. at 527.  In *Duplessis*, following a bench trial, the court entered judgment in favor of the defendant employer with respect to its former employee's harassment-based NIED claim on the basis that the defendant employer had exercised reasonable care to keep its workplace free from harassment.  *See Duplessis*, 835 F. Supp. at 683.

I find more instructive a recent decision of this court on which Worldwide relies, *Cheung v. Wambolt*, Civil No. 04-127-B-W (D. Me. June 2, 2005) (rec. dec., *aff'd* July 5, 2005), in which the defendant landlords squarely raised the issue whether, pursuant to Maine law, a landlord owes a duty to a tenant for purposes of a NIED claim.  *See* Defendant's S/J Motion at 22.  The court agreed with the defendants that in those circumstances no such "special relationship" existed, recommending summary judgment in their favor on that basis with respect to the plaintiff tenants' NIED claim.  *See Cheung*, Civil No. 04-127-B-W, slip op. at 19 ("As for the negligent infliction claim, there is nothing special about the landlord-tenant relationship between the Wambolts and Cheung or South Garden. This ordinary business relationship is not the kind of 'unique relationship' from which a special duty of care will arise to avoid causing emotional harm.").

Regardless whether Gavrilovic is properly categorized as having been an employee or an independent contractor, she points to nothing that elevated her relationship with Worldwide to the status of "special" or "unique."  *See* Plaintiff's S/J Opposition at 30-31.  Rather, from all that appears,

the relationship was in the nature of an ordinary business relationship.  Taking a cue from the First

Circuit, I am reluctant to recommend in these circumstances that the court "expand this relatively

undeveloped doctrine beyond the narrow categories addressed thus far."  *Veilleux*, 206 F.3d at 131.

Worldwide accordingly is entitled to summary judgment with respect to Gavrilovic's NIED

claim (Count X).

### H.  IIED, Common-Law Punitive Damages Claims

Worldwide next seeks summary judgment as to Gavrilovic's IIED and common-law punitive

damages claims (Counts XI and XII, respectively) on the ground that the undisputed facts do not

support a finding that its conduct was intentional, extreme or outrageous.  *See* Defendant's S/J Motion

at 23-27.  I agree.

> To state a claim for IIED pursuant to Maine law, a plaintiff must allege that:
>
> (1)  the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [its] conduct;
>
> (2)  the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community;
>
> (3)  the actions of the defendant caused the plaintiff's emotional distress; and
>
> (4)  the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Curtis*, 784 A.2d at 22-23 (citations and internal punctuation omitted).  Common-law punitive

damages "are available if the plaintiff can establish by clear and convincing evidence that the

defendant's conduct was motivated by actual ill will or was so outrageous that malice is implied."

*Palleschi v. Palleschi*, 704 A.2d 383, 385-86 (Me. 1998).

As Worldwide notes, *see* Defendant's S/J Motion at 23, Gavrilovic identifies four categories

of incidents as having resulted in her alleged severe emotional distress: (i) belittling treatment by

45

Costa and Afzal, (ii) harassment by Adams, (iii) the e-mail exchange between Worldwide managers and the site manager in Bagram and (iv) her termination of employment, *see* Defendant's SMF ¶ 110. I consider each of these categories in turn.

1.   Belittling Treatment by Costa, Afzal; E-mail Exchange

With respect to Costa, Gavrilovic adduces evidence that, during her training in Maine, he told her that (i) her function in Afghanistan was to ingratiate herself with the commanding military linguist officer and do whatever it took to advance Worldwide's contractual interests (which she took to mean that she should engage in unsavory behavior if necessary), (ii) she was fortunate to be in a management position because females are not capable of being managers, especially those without formal education such as herself, and (iii) she should count her blessings because she was one of those women who would actually enjoy staying home and taking care of a family. *See* Plaintiff's Additional SMF ¶¶ 122-23.[79] She adduces evidence of only one incident involving Afzal: his creation of the e-mail in which he referred to her as the BFT, a version of which she was provided by Remmey after he retrieved it from a computer recycle bin. *See id.* ¶ 132; Defendant's SMF ¶ 82.

As Worldwide observes, *see* Defendant's S/J Motion at 25, Costa's comments and Afzal's e-mail fall short of evincing conduct so extreme and outrageous as to exceed all possible bounds of decency. "The standard for successfully pursuing a claim of intentional infliction of emotional distress is high." *Leavitt v. Wal-Mart Stores, Inc.*, 238 F. Supp.2d 313, 316-17 (D. Me.), *vacated in part on other grounds*, 74 Fed. Appx. 66 (1st Cir. 2003). Specifically:

> [L]iability [under this element] does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must

---

[79] In her brief, Gavrilovic asserts that Costa told her she should become Captain Anderson's "coffee bitch," Plaintiff's S/J Opposition at 32; however, she omitted this allegation from her statement of additional material facts, *see generally* Plaintiff's Additional SMF. Even assuming *arguendo* that the statement were cognizable, it would not change my analysis. The comment falls within the realm of the crude, rude and vulgar, but not within the realm of the extreme and outrageous.

> necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement (Second) of Torts § 46 cmt. d; *see also Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979) (adopting section 46 of Restatement (Second) of Torts). Costa's comments – while boorish – and Afzal's circulation by e-mail to other Worldwide managers of his BFT reference – while offensive and vulgar – do not as a matter of law rise to the level necessary to sustain an IIED claim. *See, e.g., Botka v. S.C. Noyes & Co.*, 834 A.2d 947, 951-52 (Me. 2003) (upholding trial court's determination on summary judgment that defendant's conduct in assertedly interfering with plaintiffs' business activities, frequently interrupting, berating, insulting and harassing plaintiffs alone or in front of clients or others, initiating a physical confrontation with one of plaintiffs, acting imperiously, threatening plaintiffs with eviction and directing them not to sell properties to people of color did not rise to level of extreme and outrageous conduct); *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996) (upholding trial court's determination on summary judgment that university dean's conduct in incident in which he allegedly lost his temper, yelled at female faculty member in a sexist and condescending manner, calling her a "young woman," and glared at her in threatening manner across table, did not rise to level of extreme and outrageous conduct).[80]

---

[80] Gavrilovic argues that the "bounds of decency," for purposes of IIED claims, are set by Title VII and the MHRA, and that the conduct exhibited toward her clearly exceeded those bounds. *See* Plaintiff's S/J Opposition at 33. Nonetheless, my research indicates that courts, correctly in my view, have distinguished conduct necessary to state a claim under Title VII from that necessary to sustain an IIED claim. *See, e.g., Summerville v. Ross/Abbott Labs.,* No. 98-3517, 1999 WL 623786, at *2, *9 (6th Cir. Aug. 10, 1999) (sexual-harassment plaintiff's IIED claim against employer predicated on co-worker's alleged "unwelcome lewd jokes, comments, body movements and baring of body parts, as well as sexual come-ons and unwelcome touching" properly dismissed; employer's conduct did not rise to level of extreme or outrageous); *Thaman v. OhioHealth Corp.,* No. 2:03 CV 210, 2005 WL 1532550, at *17 (S.D. Ohio June 29, 2005) (sexual-harassment plaintiff's complaints of numerous sexually related comments and brief touching did not rise to level of extreme, outrageous conduct for purposes of IIED claim); *Griswold v. Fresenius USA, Inc.,* 964 F. Supp. 1166, 1174-75 (N.D. Ohio 1997) (sexual-harassment plaintiff's complaints that defendant co-worker made sexual comments to him, such as "give me a kiss" and "you have a sexy ass," touched his chest, sides and shoulders, put his arm around him and frequently puckered his lips toward him did not rise to level of extreme, outrageous conduct for purposes of IIED claim).

Further, as Worldwide notes, *see* Defendant's S/J Motion at 24, with respect to the Afzal e-mail there is no cognizable evidence from which a trier of fact reasonably could infer that Worldwide "intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from [its] conduct[,]" *Curtis*, 784 A.2d at 22 (citation and internal quotation mark omitted).  Conduct is "intentional" if the actor subjectively wanted or subjectively foresaw that his or her conduct would almost certainly result in harm to the plaintiff; it is "reckless" if the actor knew or should have known that the conduct created an unreasonable risk of causing harm. *See id.* at 23.  In this case, Remmey retrieved the e-mails in question from a computer recycle bin and provided a copy to Gavrilovic.  When Gavrilovic confronted Afzal over them, he was defensive and embarrassed.  Costa wanted to get to the bottom of what he deemed the unauthorized distribution of the e-mails to Gavrilovic: He was willing to post her to another job within Worldwide if she disclosed her source.  The only reasonable inference one can draw is that no one at Worldwide intended that Gavrilovic read the e-mail.  Thus, Worldwide cannot be said to have intentionally or recklessly inflicted severe emotional distress on Gavrilovic by virtue of the e-mail exchange.  Nor could it have reasonably foreseen that the e-mails would be retrieved and shown to Gavrilovic.

2.    Sexual Harassment by Adams

Gavrilovic contends that Adams sexually harassed her in December 2002 and January 2003, subjecting her to numerous egregious and inappropriate sexual advances while she was working under his supervision.  *See* Defendant's SMF ¶ 45; Plaintiff's Additional SMF ¶ 142.  She provides, as examples of some of the comments he made to her, (i) a suggestion that he stay in her hotel room while she was showering and changing, (ii) an inquiry as to the style and color of her undergarments and (iii) a statement that if she ever wanted to get naked, she should let him know first.  *See* Plaintiff's Additional SMF ¶ 142.  According to Gavrilovic, Adams also regularly grabbed at her buttocks and

48

thighs while working in the Worldwide work space in Bagram and frequently opened the divider to her sleeping quarters to watch her change, despite her requests that he stop doing so. *See id.*

Worldwide argues that, as a matter of law, it cannot be held liable for any intentional infliction of severe emotional distress by Adams inasmuch as the alleged objectionable conduct fell outside the scope of his employment. *See* Defendant's S/J Motion at 26-27. Indeed, with some limited exceptions that neither party raises, "[a] master is not subject to liability for the torts of his servants acting outside the scope of their employment[.]" *Mahar v. StoneWood Transport*, 823 A.2d 540, 545 (Me. 2003) (citations and internal quotation marks omitted). Conduct of a servant falls within the scope of employment only if:

> (a)  it is of the kind he is employed to perform;
>
> (b)  it occurs substantially within the authorized time and space limits;
>
> (c)  it is actuated, at least in part, by a purpose to serve the master, and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

*Id.* at 544 (quoting Restatement (Second) of Agency § 228(1)).

Worldwide posits, sensibly enough, that (i) Adams was not hired to harass Gavrilovic or anyone else, and (ii) the alleged harassment was not actuated by any purpose to serve Worldwide, was not encouraged by Worldwide (which had previously reassigned Adams when it learned of a sexual-harassment claim against him) and obviously did not benefit Worldwide in any manner. *See* Defendant's S/J Motion at 26.

Gavrilovic nonetheless rejoins that Worldwide can be held liable for Adams' conduct inasmuch as, (i) for purposes of employment-discrimination law, an employer can be held vicariously liable for a supervisor's harassment of a subordinate, *see* Plaintiff's S/J Opposition at 32-33 (citing *Harris v. Int'l Paper Co.*, 765 F. Supp. 1509 (D. Me.), *vacated in part on other grounds*, 765 F.

Supp. 1529 (D. Me. 1991), and *Faragher*, 524 U.S. at 775), and (ii) pursuant to the *Mahar* test, "it is clear that Adams's conduct was perpetuated in the context of responsibilities he was employed to perform, during the time and space limits of his work for Worldwide and often under the guise of furthering the interests of Worldwide[,]" *id.* at 33.

Worldwide has the better of this argument.  The employment-discrimination caselaw upon which Gavrilovic relies is inapposite.  For purposes of the applicable test (that enunciated in *Mahar*), no fact-finder reasonably could conclude that Adams' alleged objectionable conduct (making lewd comments, grabbing at Gavrilovic's buttocks and thighs and watching her change her clothes) was of the kind that he was employed to perform or was actuated, even in part, by a purpose to serve Worldwide.[81]  Thus, Worldwide cannot be held vicariously liable for IIED based upon that identified conduct.  *See, e.g., Mahar*, 823 A.2d at 545 (truck driver's conduct fell outside scope of employment when (i) his poor driving record did not render his subsequent assault against, and threatening of, family foreseeable, (ii) he was not authorized to leave his truck to assault family or to follow up by harassing them on highway, and (iii) it was clear his motive for assaulting and harassing family was unrelated to any interest of defendant employer); *Jones v. Ohio Veteran's Home*, No. 2002-03775, 2004 WL 2291429, at *2 (Ohio Ct. Cl. Oct. 1, 2004) ("[A]s a general rule, sexual harassment is not conduct within the scope of employment because the harassing employee often acts for personal motives that are unrelated and even antithetical to the objectives of the employer."); *Shaup v. Jack D's, Inc*., No. Civ.A. 03-5570, 2004 WL 1837030, at *2 (E.D. Pa. Aug. 17, 2004) (dismissing IIED claim against employer predicated on sexual harassment of plaintiff; observing, "The complaint makes

---

[81] As Worldwide points out, *see* Defendant's S/J Reply at 7, the only factual support cited by Gavrilovic for her contention that Adams' conduct furthered its interests and was perpetrated in the context of his job responsibilities is Plaintiff's Additional SMF ¶ 142, from which one cannot reasonably infer those things.

no allegations that the lewd comments and unwelcome sexual advances were in any way in furtherance of the employer's business, which is to serve and prepare food and drink to restaurant patrons.").

3.     Job Termination

With respect to the final category of events alleged to have caused Gavrilovic severe emotional distress – her job termination – Worldwide argues that its actions simply do not rise to the level of extreme and outrageous conduct exceeding all possible bounds of decency.  *See* Defendant's S/J Motion at 27.  Worldwide is correct.

Accepting Gavrilovic's version of events, Worldwide abruptly and for no apparent reason terminated her contract (or employment) in Afghanistan, ordering her out on the next flight to the United States.  Her story paints a picture of a baseless (or, worse, discriminatory) termination, handled in a brusque and humiliating manner.  As Worldwide itself allows, its handling of her termination "might be construed as traumatic[.]" *Id.*

Nonetheless, employment terminations – even baseless, discriminatory and/or humiliating ones – have been held as a matter of law to constitute an insufficient predicate for a claim against an employer of IIED.  *See, e.g., Staples v. Bangor Hydro-Elec. Co.*, 561 A.2d 499, 501 (Me. 1989) (upholding summary judgment in favor of defendant employer on IIED claim with respect to which plaintiff had claimed that supervisor humiliated him at staff meetings and demoted him without cause; observing, "such evidence falls far short of the *Vicnire* standard and would not warrant submitting the case to the jury"); *see also, e.g., Bagwell v. Memphis-Shelby County Airport Auth.*, No. 04-2576 M1/P, 2005 WL 2210203, at *6 (W.D. Tenn. Sept. 12, 2005) ("The conduct alleged – issuance of written work orders and reprimands, denial of vacation time, disregard for doctor's orders, and termination of employment – cannot be characterized as extreme, atrocious or utterly intolerable in a civilized community.") (citation and internal quotation marks omitted); *Thaman*, 2005 WL 1532550, at

*17 ("[W]ith respect to Plaintiff's termination, Ohio courts have consistently held that an adverse employment action, even if based on discrimination, is not extreme and outrageous conduct without proof of something more."); *Newtown v. Shell Oil Co.*, 52 F. Supp.2d 366, 375 (D. Conn. 1999) (negligent failure to prevent sexual harassment and termination of employment insufficient to support IIED claim); *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172 (D.C. 1997) (noting, in case in which plaintiff alleged he was subjected to contempt, scorn and other indignities in the workplace by his supervisor and an unwarranted evaluation and discharge, "[w]hile offensive and unfair, such conduct is not in itself of the type actionable on this [IIED] theory.").

For the foregoing reasons, Worldwide demonstrates its entitlement to summary judgment with respect to Gavrilovic's IIED and common-law punitive damages claims (Counts XI and XII, respectively).

### I.  Contract Claim

In Count XIII of her amended complaint, alleging breach of contract, Gavrilovic asserts that Worldwide breached several enumerated provisions of the December Agreement in refusing to pay $1,156.12 in hospitalization and surgery charges, $675.60 in lodging and transportation costs related to her surgery and convalescence and $840 toward a food allowance for the days she was away from Bagram.  *See* Complaint ¶¶ 102-14.  Worldwide's bid for summary judgment as to the entirety of this count, *see* Defendant's S/J Motion at 27-28, falls short in several respects.

Worldwide reasons that it is entitled to summary judgment as to Count XIII  inasmuch as (i) Gavrilovic relies on incorporation of the federal Defense Base Act ("DBA"), 42 U.S.C. § 1651 *et seq.*, into the December Agreement, (ii) she does not fit the relevant definition of an "employee" for purposes of the DBA (which Worldwide contends is the definition imported from the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*), and (iii) Gavrilovic in

any event was not an "employee" for purposes of the DBA because she was an independent contractor. *See id.*

As an initial matter, Worldwide errs in asserting that Gavrilovic relies on incorporation by reference of the DBA for the entirety of the breach-of-contract count. She grounds her claims for lodging and meal allowances, instead, on express contract provisions. *See* Complaint ¶¶ 103-04; December Agreement ¶ 3(a) ("Government quarters shall be made available to the Subcontractor. If government quarters are not available, compensation shall be provided to Subcontractor as a lodging allowance."); *id.* ¶ 3(b) ("If meals/rations are not provided by the government then compensation shall be provided to Subcontractor as a meal allowance.").[82] Worldwide supplies no argument whatsoever why it should be entitled to summary judgment with respect to these components of the breach-of-contract count. *See* Defendant's S/J Motion at 27-28.[83]

While Gavrilovic does rely on incorporation of the DBA for purposes of her claim for costs of emergency medical expenses, *see* Complaint ¶¶ 105, 113, December Agreement ¶ 5(a), Worldwide's arguments on that front fail, as well, for the following reasons:

1.     While the DBA does, indeed, apply provisions of the LHWCA to certain employees of defense contractors, it clearly does not import the LHWCA definition of "employee" – "any person engaged in maritime employment," 33 U.S.C. § 902(3) – into the DBA. To do so would defeat the purpose of the DBA, which was to broaden application of the LHWCA to new classes of employees. *See, e.g., Davila-Perez v. Lockheed Martin Corp.,* 202 F.3d 464, 468 (1st Cir. 2000) ("The purpose of the Defense Base Act is to provide uniformity and certainty in availability of compensation for

---

[82] The December Agreement is referenced in, and attached to, the Complaint. *See* Complaint ¶¶ 103-04. Hence, I quote its exact provisions.

[83] In opposing summary judgment, Gavrilovic relies on an alleged oral promise by Costa – a basis for breach of contract not pleaded in her amended complaint. *See* Plaintiff's S/J Opposition at 33-34; Complaint ¶¶ 102-14. I need not take cognizance of her unpleaded claim inasmuch as Worldwide, in any event, falls short of demonstrating its entitlement to summary judgment with respect to Count *(continued on next page)*

injured employees on military bases outside the United States."); *Pearce v. Director*, 603 F.2d 763, 765 (9th Cir. 1979) ("Congress passed the Defense Base Act in order to provide workers' compensation coverage for specified classes of employees working outside the continental United States.  Instead of drafting a new workers' compensation scheme, Congress extended the already established Longshoremen's Act, as amended, to apply to the newly covered workers.") (citation and internal quotation marks omitted); *see also, e.g*., 42 U.S.C. §§ 1651, 1654 (defining classes of covered and excluded employees).  Thus, Gavrilovic did not have to be a maritime worker to be covered under the DBA.

2.     As noted above, there is a genuine issue of material fact whether Gavrilovic was an employee rather than an independent contractor.

Worldwide accordingly falls short of demonstrating entitlement to summary judgment with respect to Gavrilovic's breach-of-contract claim (Count XIII of the Complaint).

### IV.  Conclusion

For the foregoing reasons I recommend that Worldwide's motion for summary judgment be **GRANTED** as to (i) Counts IX-XII and (ii) Counts I-V, but only to the extent based on disparate treatment in pay or opportunities, and otherwise **DENIED**.  If this recommended decision is adopted, remaining for trial will be (i) Counts I-V to the extent not based on disparate treatment in pay or opportunities, (ii) Counts VI-VIII and (iii) Count XIII.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral*

---

XIII.

54

*argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to __de novo__ review by the district court and to appeal the district court's order.*

Dated this 8th day of December, 2005.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge