## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| **TANJA GAVRILOVIC,** ) | |
| ) | |
| **PLAINTIFF** ) | |
| ) | |
| **v.** ) | **CIVIL NO. 05-38-P-H** |
| ) | |
| **WORLDWIDE LANGUAGE** ) | |
| **RESOURCES, INC.,** ) | |
| ) | |
| **DEFENDANT** ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 19-21, 2006, I conducted a bench trial on the plaintiff's claim of sexual harassment, retaliation, defamation and breach of contract. These are my findings of fact and conclusions of law.

### I. FINDINGS OF FACT

1.    Tanja Gavrilovic, the plaintiff and a United States citizen, is fluent in both English and Serbian.

2.    Worldwide Language Resources, Inc. ("Worldwide"), the defendant and a Massachusetts corporation, has its headquarters in Rumford, Maine. Lawrence Costa is the founder, owner, and president of the company. Worldwide is in the business of supplying linguists to military forces in various countries. Its overseas facilities are located mainly on military bases.

3. In the late fall of 2001, Worldwide engaged Gavrilovic as an independent contractor linguist in Kosovo, to provide Serbian language services to NATO headquarters in Pristina.

4. During the engagement interview for this Worldwide job, a Worldwide linguist asked Gavrilovic questions about her intimate sexual life. Gavrilovic protested that such questions were irrelevant to the job interview. At the conclusion of the interview, the interviewing linguist told Gavrilovic that Worldwide would employ her and obtain a security clearance for her.

5. Gavrilovic complained about the interview to Worldwide Vice President Jamie Williamson, when he arrived in the region. Before leaving Kosovo, Williamson gave Gavrilovic a business card, on the back of which was written a phrase akin to "The whisper of a woman is heard further than the roar of a lion." Gavrilovic also complained to Worldwide Vice President Brian Remmey, when he arrived in the region several weeks after Williamson. As a result, Worldwide terminated the other linguist.

6. Gavrilovic continued her independent contractor engagement as a Serbian linguist, but also began to take on more duties. She assisted a new site manager, Alexander Cline, in drafting a proposal for a new Balkans contract for which Worldwide was bidding. The proposal designated Gavrilovic as a Deputy Site Manager, a position that would involve administrative, not translation, functions.

7. Worldwide did not obtain the new Balkans contract, and its NATO contract ended in October of 2002.

8.     Cline and Remmey orally offered Gavrilovic a Worldwide position in Afghanistan as a manager (along with three others) of linguists based at the military base in Bagram.  The linguists in Afghanistan spoke Pashtun, Farsi, and Dari, none of which Gavrilovic spoke.  Gavrilovic accepted the offer.

9.     After accepting, Gavrilovic traveled from Kosovo to the United States for approximately two and a half weeks.  During that time she traveled to the Rumford, Maine, home office of Worldwide for training before deploying to Afghanistan.  She was in Rumford from approximately December 1, 2002 to December 5, 2002.  Worldwide paid all her associated plane travel (both domestic and international, other than military transport), and her lodging and living expenses in Rumford.  Gavrilovic did not bring employment tools or supplies to Rumford, and brought only personal clothing.

10.    While in Rumford Gavrilovic reported to Worldwide's home office daily to receive training from various people.  She learned about the Afghanistan mission and issues pertaining to the Afghanistan linguists, reviewed personnel folders, and learned how Worldwide's home office in Rumford supported the Afghanistan mission.

11.    In Rumford, Remmey (on behalf of Worldwide) and Gavrilovic signed a contract concerning her employment in Afghanistan.  The document was a contract for linguists, entitled "Independent Subcontractor Agreement" at the top.  It stated that the placement was in Afghanistan and that the language Gavrilovic spoke was Serbian.  The contract began on December 1, 2002, and ended on November 30, 2003, and provided for payment of $5,375 per month.  When

Gavrilovic asked Remmey and Kevin Ellingwood, Director of International Operations, why she was being offered a linguist contract, she was told that it was the only contractual document that Worldwide had.

12.     Gavrilovic understood that she would be a manager of linguists in the Afghanistan assignment and that there were three levels of hierarchy.  The top level was the Site Manager, Kevin Adams.  Under him was Kamran Afzal, the Deputy Site Manager.  Below Afzal was John Bishop, as well as Gavrilovic.  Gavrilovic was an equal of Bishop, but supervised by both Afzal and Adams.[1]

13.     In Rumford, Costa told Gavrilovic that her duties in Afghanistan were to follow the senior military officer around, do whatever he wanted ("[i]f he wants a cup of coffee, get him a cup of coffee"), and learn anything she could about government contracts to send back to the Worldwide home office in Rumford, Maine.

14.     Gavrilovic did not receive an employee handbook, personnel polices, complaint procedure forms or insurance information.  Worldwide presented no evidence that the Company had any written sexual harassment policies for its overseas locations or that it trained Gavrilovic or any other manager assigned overseas about sexual harassment policies.[2]

15.     Worldwide's facility in Afghanistan is located entirely on the Bagram

---

[1] At trial there was some ambiguity as to this matter.  Costa testified that Afzal and Bishop were equals.  But an email from Vice-President Williamson to Adams in April or May, 2003 (found in Joint Exhibit 22), gave a numbered list of Bagram managers in the order of (1) Adams, (2) Afzal, (3) Bishop, (4) Gavrilovic, and stated of the list: "The numbering . . . is not indicative of hierarchy with the exception of Kevin [Adams] & Kam [Afzal]. Below [these] two, all pigs [sic] are equal."  I credit Gavrilovic's understanding of the hierarchy.

[2] Worldwide President Costa made a vague reference to military regulations that govern even
*(continued on next page)*

military base.  The military provides Worldwide's Bagram personnel with needed office supplies, most of the furniture, and sleeping accommodations on the base. Worldwide personnel share an office space and living quarters, each located in different military tents.

16.    On December 5, 2002, Gavrilovic left Rumford, Maine to travel to Bagram, Afghanistan, by way of Turkey.

17.    When Gavrilovic arrived at the Incirlik military base, in Adana, Turkey, she met Adams, her supervisor.  At that first meeting, Adams offensively harassed her in a sexual manner.  From this point onward during December, Adams continuously and offensively harassed Gavrilovic in a sexual manner.  I see no reason to recount all the offensive details.  The harassment occurred on multiple occasions: in Adana, Turkey, on the Incirlik base on December 5; at the Karshi Khanabad military base ("K-2") in Uzbekistan from approximately December 5 until approximately December 15; at the Bagram military base in Afghanistan from approximately December 15 until near the end of December; and again in Adana, Turkey, on the Incirlik base in the last days of December, 2002.  When confronted with Adams's harassing behavior, Gavrilovic either ignored him, or told him that she wanted him to stop.

18.    During an R&R (rest and relaxation) trip to Tashkent on January 1, 2003, two current or former Worldwide linguists, Jakhongir Fayziev and Shatana Fayziev, had the opportunity to observe Gavrilovic and Adams interacting.

---

civilian conduct on American military bases abroad.  I was presented no such regulations or argument about them.

Jakhongir Fayziev drove the two (along with other Worldwide managers) on the five and a half hour car ride from K-2 to Tashkent.  He testified that he did not observe Adams engaging in behavior towards Gavrilovic that he would characterize as harassing or inappropriate.  In Tashkent, Adams met his girlfriend (later his wife).  She stayed with the group in Tashkent for the entire eight to ten day trip. Jakhongir and Shatana Fayziev also stayed with the group in Tashkent, and testified at trial that during that time they did not observe Adams engaging in behavior towards Gavrilovic that they would characterize as harassing or inappropriate.  Gavrilovic also testified that Adams's girlfriend was present during most of the Tashkent trip.  Gavrilovic stated that on this occasion the only time Adams harassed her was during the car ride to Tashkent.  In any event, it is undisputed that the harassment came to an end on January 1, 2003.

19.    Gavrilovic and Adams returned to Afghanistan near the beginning of the second week of January, 2003.

20.    During the months of December, January, February, and March, Gavrilovic did not report Adams's December, 2002, harassment to any Worldwide personnel.  Initially Gavrilovic believed that Costa and Remmey would arrive in Bagram in January, 2003, and she wanted to report to them in person.  The landline telephone to which Worldwide personnel had access at Bagram was located in an area through which active military personnel often traveled, and thus suffered from a lack of privacy.  During some of the time she was at Bagram, Gavrilovic also had access to a cordless satellite phone, which could be taken to private locations by the user, and email access to people in the Worldwide home

office.  I do not find that she had ready access to superiors in Rumford during her time at Bagram in December, however, a period of time during which her supervisor, Kevin Adams, told her just to sit in the tent and take messages from anyone who came by.

21.    Adams left Bagram at the end of January or the beginning of February, 2003, for Uzbekistan.  Afzal left Bagram around the same time.  Bishop went to the United States for a period of R & R.  Gavrilovic was the only remaining site manager for linguists in Bagram beginning in early February.

22.    At that time Gavrilovic undertook what she considered proper site manager duties.  She filled out and updated the "matrix," a Worldwide document that listed the linguists, their languages, their locations, and their status.  She distributed this form to both the Worldwide home office and the commanding military officer at Bagram in charge of linguists.  Gavrilovic believed that she was required to use this form and not authorized to create any new policies, procedures, documents, or forms.   She acted as the primary Worldwide representative with the military, and communicated with military personnel daily.  Additionally, she acted as the linguist liaison with the Worldwide home office on personnel matters such as reimbursement, pay, and contract issues.  She had contact with the Worldwide home office, mainly via email, almost daily.

23.    Gavrilovic did not receive identification stating that she was a Worldwide manager, but she did wear a Worldwide Language Resources shirt every day.  Adams and Bishop wore similar shirts regularly.  (Afzal wore a military

uniform.)  Gavrilovic received these shirts both from the Worldwide home office and from Adams.

24.     Adams returned to Bagram for a brief visit once during this time while Gavrilovic was alone, around February 19, 2003.  When Adams returned, he told Gavrilovic that he was pleased with her performance and had heard good reports from the military.  Gavrilovic herself received reports from military personnel that she was doing a good job during this time period.  She never received a report that she was doing a poor job.

25.     While she was at Bagram, Gavrilovic developed an intimate personal relationship with a rigger on the flight line who packed parachutes.  Gavrilovic did not have any other intimate personal relationships at Bagram.

26.     Around March 19, 2003, Gavrilovic became ill.  On March 22 she went to the Bagram hospital, and was diagnosed as having gall stones.  On March 26 she flew to Landstuhl, Germany for surgery.  The surgery occurred on March 31.  John Bishop flew to Germany with her, because Adams directed him to be her "medical attendant."   Before she had surgery, Gavrilovic inquired whether Worldwide would pay her medical expenses.  Costa agreed orally to pay them, and Adams communicated Costa's promise to Gavrilovic.

27.     Gavrilovic remained in Landstuhl, Germany for approximately five weeks to recuperate after her successful surgery.  For much of that period she stayed in the Fisher House across from the hospital with Bishop.  During this time, Bishop did not work as a site manager, and instead acted as Gavrilovic's medical attendant and monitored her progress.

28.    While they were in Germany, some time shortly before or after her surgery, Gavrilovic told Bishop of Adams's harassing conduct.

29.    While she was recuperating in Germany, Costa authorized a pay increase for Gavrilovic to $6,125.00 per month.  Adams told her that it was for the good job that she did while she was the only site manager in Bagram.  Gavrilovic received confirmation of the pay raise by a direct deposit to her bank account on May 2, 2003.

30.    Around April 13, 2003, while Gavrilovic  was recuperating in Germany, Ellingwood (in Rumford) received an email from Afzal (found in Joint Exhibit 2) in which Afzal referred to Gavrilovic to as "Tanya 'The Bagram Fuck toy.'"  The email also characterized Gavrilovic's job performance as poor, and referred to hiring a person to replace Gavrilovic.  Ellingwood could not recall whether the email was addressed to any other Worldwide employees or staff.  Ellingwood was concerned about the comment, considering it degrading, harassing, and unprofessional.  He brought the email to the attention of both Costa and Williamson, and spoke personally with both of them about it.[3]

31.    Costa also found the "Bagram Fuck toy" language unprofessional and extremely vulgar.  Costa directed Williamson to reprimand Afzal in writing and

---

[3] At trial, Costa and Ellingwood testified that they could not recall the exact date that Afzal sent the email.  I find that it was sent on or around April 13, 2003, because that is the date that Williamson stated he counseled Afzal about this email in Plaintiff's Exhibit 19, a "Memorandum for Record" dated July 2, 2002.  Although the compilation document in which Afzal's email appears, Joint Exhibit 22, has a header with the date of May 1, 2003, that header clearly does not belong to the Afzal email:  it is in a different font, appears to be from Williamson, and Afzal's email does not appear directly below it.  For these reasons, and because the email compilation is just that—a compilation in which most email headers were removed—I credit the April 13 date over the May 1 date that the attorneys referred to at trial.  If May 1 is in fact the correct date, however, my decision would not change.
*(continued on next page)*

9

directed Ellingwood to call Afzal and reprimand him verbally.  Both Williamson and Ellingwood complied with Costa's order.  Ellingwood called Afzal the same day that Costa directed him to do so, and verbally reprimanded him.  Williamson verbally reprimanded Afzal around that time as well, and then followed this with a written memorandum to Afzal's file, see Plaintiff's Exhibit 19.

32.    During the last half of April, 2003, Costa sent Remmey to Bagram. Costa did so because he believed that Remmey was disruptive to others in the Rumford office.  He also did so in order to keep Remmey away from the Rumford office, because Costa had received reports from the head of the Finance Department that Remmey had gained unauthorized access to the company's accounting software and financial documents.

33.    By early May, 2003, Costa was aware of contradictory reports on Gavrilovic's job performance.  Remmey had told Costa that Gavrilovic was doing a good job in Afghanistan, but Adams had told Costa that the linguists in Afghanistan had complained about Gavrilovic's job performance, and Afzal had told Costa that Gavrilovic had used offensive terms about people and religion in Afghanistan.

34.    By early May, 2003, Costa had decided to transfer Gavrilovic out of Bagram.  He made the decision primarily because he wanted to "defuse" the situation between Gavrilovic and Afzal and partially because of the negative reports he had heard from Adams and Afzal about Gavrilovic's job performance.[4]

---

[4] At trial he testified that he also wanted to bring her back in order to aid his investigation of how the security of the email server was breached.  At this point, however, he had not yet seen the *(continued on next page)*

35.     Around this time, at least one senior manager of Worldwide, Williamson, believed that Afzal had done important work or made important contacts that might turn out to be very lucrative for the company and perhaps lead to a new or renewed contract.  Referring to Afzal's contacts, Williamson said that they could "turn out to be our Golden Goose" in an email to Adams.

36.     On approximately May 6, 2003,[5] unaware of any dissatisfaction with her job performance, Gavrilovic returned from Germany to Bagram, accompanied by Bishop.  Afzal was present in Bagram at that time, but Adams was not. Remmey also was present.  Gavrilovic intended to resume her duties as she had been performing them before her illness.  She asked Afzal what needed to be done, and asked him to fill her in on what had happened.  Afzal declined to share any management responsibilities with Gavrilovic, and told her to just sit there, because he had it "taken care of."

37.     On the day after her arrival, approximately May 7, 2003, Gavrilovic met with Remmey and spoke to him about Adams's sexual harassment during December.  Remmey told her that this was not the first such complaint against Adams.

38.     The previous sexual harassment complaint against Adams occurred in 2002.  In March of that year a female linguist in Uzbekistan complained via email to Ellingwood that Adams (her supervisor) sexually harassed her.  Ellingwood

_____

email that raised security concerns, and thus Costa could have no belief that there had been any unauthorized access to the email server.  Perhaps Gavrilovic's access to the email explains the precise timing that Costa pulled her out of Bagram, on a decision that had already been made.
[5] Gavrilovic testified that the date was either May 5 or May 6, 2003.  I find that it must have been May 6, because of the succeeding sequence of events that led to her leaving Afghanistan on May 9, *(continued on next page)*

informed Remmey and Costa of that complaint, and both became angry upon learning of Adams's conduct.  As a result of the complaints, Adams was removed from Uzbekistan and returned to the United States at the direction of Costa.  Two months later, Worldwide rehired Adams at the Guantanamo Bay site for several months.  After assigning Adams to Guantanamo Bay, Costa discussed the complaint further with Remmey, who disbelieved the complaint based on his knowledge of Adams's character.  Costa also spoke with a female Worldwide contractor who roomed with the harassee.  She told Costa that she disbelieved that harassment occurred based upon her personal observations of the interactions between the two.  As a result, Costa decided to assign Adams to Afghanistan, where he would once again exercise supervisory authority.

39.    The day after Gavrilovic told Remmey of Adams's harassment in December, approximately May 8, 2003, Remmey gave Gavrilovic four pages of documents, a compendium of different emails.  One of the emails appeared to be from Afzal and was a duplicate of the email sent to Ellingwood in which Afzal disparaged Gavrilovic's job performance, discussed her replacement, and referred to her as "Tanya 'the Bagram Fuck toy.'"

40.    Gavrilovic was shocked, angered, hurt, and highly offended by the reference to her as the "Bagram Fuck toy."  She understood it to refer to her as a whore who slept around promiscuously in Bagram, and to mean that she was just a toy to be played with.  She was also surprised and upset that her job performance was characterized as poor, especially since she had just received a

---

2003.

pay raise, and because it appeared that replacing her was being discussed while she was recuperating in Germany.

41.    After several minutes to cool down, Gavrilovic found Afzal and confronted him about the email.  She asked him to explain it to her.  Afzal responded that he did not need to tell her anything, and then asked her where she obtained the email.  Gavrilovic refused to tell him where she got the email, and asked him again to explain the email and the statement.  Afzal responded that he was "the fucking man," that he "r[an] this fucking show," and that he "d[id]n't have to tell her anything."  Gavrilovic picked up the papers and left the tent.

42.    Gavrilovic told Remmey about her exchange with Afzal, and informed him that she was going to call the Worldwide home office.  She then used the satellite phone to try to call Costa at Worldwide in Rumford.  She did not reach Costa, and spoke instead to Williamson.  Gavrilovic told Williamson that she wished to speak to Costa, but not the reason why.  Williamson told Gavrilovic that she and Remmey should "have a nice ride home."  Gavrilovic insisted that she wished to speak to Costa, but Williamson told her to call him at her convenience and hung up.

43.    Gavrilovic informed Remmey of her conversation with Williamson. Remmey told Gavrilovic that he was attempting to contact Costa himself, by sending emails.  While she was sitting with Remmey, Afzal came up to them and took them aside individually.  Afzal told her to pack her stuff, and that she was to be out of Afghanistan on the next plane.

44.     In the next twenty-four hours, Gavrilovic packed her possessions, made shipping arrangements and travel plans.

45.     Around 2:00 a.m. Eastern Daylight Time on that same day, May 8, Costa received a phone call from Remmey.  During that phone call Remmey told Costa that there were management and personnel problems among the site managers in Afghanistan.  Remmey may or may not have told Costa at that time that Gavrilovic had been harassed by Adams.  The conversation lasted five to ten minutes.  Remmey sent Costa an email after this phone call, at 8:08 a.m. Eastern Daylight Time (5:08 a.m. Pacific Daylight Time according to the email), which Costa read on the morning after the phone call.  In the email Remmey explained: "Attached is the text of the composite emails that I pulled out of Kamran [Afzal]'s recycle bin."  The attachment was the same document that Remmey had given to Gavrilovic.  One of the emails was the email from Afzal calling Gavrilovic the "Bagram Fuck toy."

46.     Upon seeing the email compendium, Costa was concerned that Remmey had gained unauthorized access to Worldwide's email server.

47.     Costa ordered Remmey, via email sometime before 12:54 p.m. Eastern Daylight Time (9:54 a.m. Pacific Daylight Time according to the email) on May 8, to return to the United States.  In the email Costa stated: "Return immediately. No Questions.  No Calls.  Just do it."  Costa testified that he ordered Remmey to return because he was concerned about Remmey being disruptive at the Bagram site, and because he wanted to investigate the suspected email server intrusion.

48.     On approximately May 9, 2003, the day after being ordered by Afzal to return to the United States, Gavrilovic departed Bagram and returned to the United States via Uzbekistan and Turkey.  She traveled to her home in Parma, Ohio.

49.     Costa terminated Gavrilovic's security status on May 9, 2003.  Costa routinely terminates the security clearance of all Worldwide employees or contractors once their employment is terminated or they no longer need security clearance.

50.     Gavrilovic learned that her security status was terminated after she came back from Afghanistan but before she contacted Costa about her status.

51.     Gavrilovic sent an email to Costa on May 12, 2003, stating that she was awaiting his instructions for work.  She did not receive a response.

52.     On May 14, 2003, Gavrilovic sent another email to Costa, asking about her status with the company.  Costa responded on that day via email, told her that Ellingwood should have called her that morning to discuss available positions, and told her to call Ellingwood if she got a chance.  Gavrilovic did not call Ellingwood that day.

53.     On Friday, May 16, 2003, Gavrilovic sent Ellingwood an email asking about her status.

54.     Ellingwood replied on Monday, May 19. In his email he stated that the security of the email server had been compromised while Gavrilovic was in Bagram, that she received a copy of an email that was not addressed to her, and that this was cause for great concern by Worldwide.  His email stated:

> What Worldwide Language Resources is requesting from you is a written statement explaining how you obtained this email. This needs to be notarized and sent here to the main office. We do have a position for you in Iraq. You have also stated when you were here in the office that you do not like Muslims, will this be a problem with this position in Iraq, as you know the majority of the population is Muslim.

55.     Gavrilovic did not respond to this email in any manner, and the company did not offer to return her to her position in Afghanistan.

56.     Gavrilovic has not received any payments on her contract since May 2, 2003.

57.     Worldwide reported Gavrilovic's income on Internal Revenue Service Form 1099-Misc for the years of 2002 and 2003.

58.     As of March, 2005, the Department of the Army's records showed that Gavrilovic owed $1,098.80 to satisfy her medical bills incurred at Landstuhl Hospital.

59.     During the course of her recuperation, Gavrilovic was also billed a total of $680 by Fisher House, $290 of which was the room rate, and $390 of which was the telephone charge. She incurred incidental expenses such as taxi fares and lodging while traveling, in the amount of $385.60. Gavrilovic sought reimbursement from Worldwide for these amounts, plus the amount of $840 for food expenses ($20 per diem) in a series of written and email communications with Worldwide employees in May and June, 2003. During those communications Gavrilovic decided not to pursue reimbursement for the $390 in telephone charges. Gavrilovic has not received any money from Worldwide for any of these bills.

60.     Costa refused to pay Gavrilovic's medical bills and reimbursement requests only because Gavrilovic declined to continue her employment by signing an affidavit as to her knowledge of the emails' origin.

61.     Gavrilovic suffered depression, which initially made her unable to find a job.  By August, however, she was assisting Russian Eastern European Program ("REEP"), a competitor of Worldwide, in creating a linguist contract proposal for Iraq (although she did not get paid for her assistance).  In November, 2003, she accepted employment at Bed Bath and Beyond as a department manager, and earned approximately $3,333 per month.

62.     Tanja Gavrilovic was a credible witness.  Lawrence Costa was a credible witness, except as to some small matters that I have addressed separately.  Both of them have an obvious interest in the outcome of this lawsuit. Kevin Ellingwood was a credible witness, with no interest in the outcome. Ellingwood is no longer a Worldwide employee.  Jakhongir and Shatana Fayziev, Myron Murley, and Najla Farzana were credible witnesses.  Brian Remmey was generally not a credible witness; there was substantial evidence that he is both financially and personally motivated to bring about the downfall of Worldwide, Costa, or both.  Kevin Adams was not a credible witness, except as to chronology and locations.

## II. CONCLUSIONS OF LAW

### A.    *Jurisdiction*

The defendant removed this case from state to federal court based upon

federal question jurisdiction, 28 U.S.C. § 1331.

### B.    *Threshold Issues*

#### (1) *Independent Contractor/Employee Issue*

The parties agree that federal[6] and state[7] law prohibiting discrimination and

retaliation protect only employees, not independent contractors.  First, therefore, I

determine whether Gavrilovic was an independent contractor or employee at the

time of the alleged sexual harassment and at the time of the alleged retaliation.

Worldwide maintains that individuals located in the Rumford home office were

employees but that all overseas workers were independent contractors.  Gavrilovic

maintains that in Afghanistan (unlike in Kosovo), she was an employee. My

conclusion is the same for both federal and state law: for the Afghanistan

assignment, Gavrilovic was a Worldwide employee.

It is true that Gavrilovic signed a subcontractor agreement with Worldwide

for her positions, both as a linguist in Kosovo, Joint Exhibit 4, and as a site

manager at Bagram, Joint Exhibit 5.  The document for Afghanistan labels her as

an "Independent Subcontractor," sets forth a fixed term of December 1, 2002

through November 30, 2003, and provides no employee medical benefits.  But in

determining whether Gavrilovic is an employee, the First Circuit has made clear

that I do not examine this "Independent Subcontractor Agreement" in isolation;

---

[6] Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e <u>et</u> <u>seq</u>.

rather, under the "common law agency test," I look to the substance of the relationship.  This contractual document is but one of several factors relevant to the analysis.  <u>Alberty-Vélez v. Corporación de Puerto Rico para la Difusión Pública</u>, 361 F.3d 1, 6-7 (1st Cir. 2004) (outlining the relevant factors to be considered in applying the common law test).  As "in most situations," in this case "the extent to which the hiring party controls 'the manner and means' by which the worker completes her tasks [is] the most important factor in the analysis." <u>Id</u>. at 7.  Similarly, under Maine Law "control is the most important factor in determining whether an individual is an employee or independent contractor." <u>Legassie v. Bangor Publ'g Co.</u>, 741 A.2d 442, 444 (Me. 1999).  The Law Court explains that the key is distinguishing "[t]he right to control the 'details of the performance,' present in the context of an employment relationship . . . from the right to control the result to be obtained, usually found in independent contractor relationships." <u>Id</u>.  <u>See</u> <u>also</u> <u>Murray's Case</u>, 154 A. 352, 354 (Me. 1931) ("An independent contractor must have under the employment some particular task assigned to him which he has a right to complete and is under obligation to complete, and must be subject to no control in the details of the doing.") (listing eight relevant factors to consider).

Some evidence does suggest that Gavrilovic was not an employee.  For example, she never received a W-2 form nor a weekly or biweekly paycheck, but instead received a Form 1099 reflecting payments from Worldwide.  Moreover, the United States military, not Worldwide, was the source of the majority of

---

[7] Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 <u>et</u> <u>seq</u>.

instrumentalities and tools that Gavrilovic used at her job.  But the evidence demonstrates that Worldwide directed Gavrilovic's day-to-day activities, maintaining significant control over "the manner and means" by which she performed her duties as well as the details of her performance.  See Alberty-Vélez, 361 F.3d at 7; Legassie, 741 A.2d at 444.  Additionally, Gavrilovic had little "freedom . . . to do the work without direction," and no ability "to control the result to be obtained,"  Legassie, 741 A.2d at 446; id. at 444.

I find the following to be particularly persuasive: (1) Worldwide did not hire Gavrilovic for her specialized Serbian language skill; rather, Worldwide engaged her as a junior-level manager in Afghanistan not required to bring specialized tools or implements to her post; (2) Worldwide obtained Gavrilovic's necessary security clearance, maintained that clearance for her, and defined her position; (3) Worldwide required Gavrilovic to go to its Rumford company headquarters for training and instruction from various Worldwide employees on how to perform her job as a junior level manager, and paid all her transportation, lodging and meal expenses; (4) Worldwide paid for her flight overseas or arranged military transport for her; (5) As soon as Gavrilovic arrived in Turkey, she began moving all around the region, solely at the direction of her Worldwide supervisor; (6) Once she arrived at her permanent duty station at Bagram, Gavrilovic lived in a tent with only people hired by Worldwide and worked in a communications tent at an assigned Worldwide work station; (7) Gavrilovic was not permitted to take on much linguist management work when she first arrived, but when the Bagram site became short-staffed, she was expected to and did take on additional linguist management

duties; (8) while Gavrilovic was at Bagram, she completed a Worldwide daily status report form (the "matrix") and had no authority to create new independent forms or protocols on her own; (9) Gavrilovic communicated almost daily with the Worldwide home office; (10) While Gavrilovic was at Bagram, she worked for no one except Worldwide and made no attempt to solicit any independent contractor business from others; (11) Gavrilovic wore a Worldwide shirt to work every day; (12) Gavrilovic had no authority to hire any assistants; and (13) Worldwide paid Gavrilovic monthly, and unilaterally raised her rate of pay in 2003; (14) Worldwide agreed to pay Gavrilovic's medical expenses in Germany and sent Bishop at Worldwide expense to accompany her; (15) Worldwide ordered Gavrilovic to return to the United States as if she were an employee; (16) the so-called independent subcontractor document did not accurately describe the relationship with Gavrilovic and was used instead because it was the only document available.

I conclude that under both federal and Maine law, Gavrilovic was a Worldwide employee during the Afghanistan assignment.

### (2) Federal Enclave Issue

Worldwide asserts that Gavrilovic's state law claims (Maine Human Rights Act, contract and common law defamation) must fail because the relevant acts occurred at the Bagram Air Force base—a "federal enclave over which the United States government exercises exclusive federal legislative jurisdiction." Def.'s Trial Br. at 6 (Docket Item 89). Article I, Section 8, Clause 17 of the United States Constitution (the "enclave clause") reserves to Congress the power to:

> exercise exclusive Legislation in all Cases whatsoever, over
> such District (not exceeding ten Miles square) as may, by

> Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards and other needful Buildings.

I reject this defense because:

(a)     As Gavrilovic points out, it is doubtful that the defense applies to military bases that are in foreign countries.  See Pl.'s Mem. of Law Addressing Applicability of "Federal Enclave Jurisdiction" at 2-3, 9 (Docket Item 107). This conclusion flows from the express language of the enclave clause.  It speaks only of Congress's exclusive authority over the District of Columbia, and over State land purchased by Congress with the consent of the State Legislature in which the land is located.  See U.S. Const. art. I, § 8, cl. 17; see also Torréns v. Lockheed Martin Servs. Group, Inc., 396 F.3d 468, 469-71 (1st Cir. 2005) (in discussion of enclave clause doctrine, referring only to land acquired from states and the Commonwealth of Puerto Rico).  Moreover, the defendants do not cite any case holding that the enclave clause applies to bases on foreign soil.  The only case that I can find dealing with this issue holds that it does not apply in such circumstances.  See Nguyen v. Allied Signal, Inc., No. C98-03616, 1998 WL 690854, *1 (N.D. Cal. Sept. 29, 1998) (rejecting defendant's argument that federal enclave doctrine precluded state tort claims arising from plaintiff's exposure to asbestos on military base in Vietnam).

(b)     Although it appears that Afzal wrote the email using the offensive epithet at the Bagram base, and that Gavrilovic ultimately read it at the base, the emails were first published at the home office in Rumford, Maine.  It is publication

that makes the defamation actionable,[8] and that occurred in Maine, not on a military base.

(c)     The alleged retaliation against Gavrilovic occurred partly in Maine. Rumford company senior management in Maine directed Gavrilovic back to the United States.   Likewise, management in Rumford discontinued her security clearance.   Therefore, a retaliation claim under the Maine Human Rights Act is available.[9]

(d)     The employment contract was entered into in Maine.

### (3) *Federal v. State Law*

There is no material difference between federal and state law on the sexual harassment and retaliation claims (I-V).   Because the relevant provisions of the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 et seq. are similar to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., Maine courts look to Title VII case law in construing the MHRA.   Maine Human Rights Comm'n v. Maine Dep't of Def. and Veterans' Servs., 627 A.2d 1005, 1007 (Me. 1993).[10]

The defamation claims (VI, VII, VIII) and breach of contract claim (Count XIII) are Maine law issues only.[11]

---

[8] See generally Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 2.5.1 (3d ed. 2005).

[9] Most if not all of the actual harassment occurred on military bases, but my evaluation of her sexual harassment claims is the same under state and federal law in any event.

[10] There is some question whether the plaintiff pursued a state law retaliation claim.  See Pl.'s Final Pretrial Mem. at 2 (Docket Item 69) and Final Pretrial Order at 1-2 (Docket Item 74).  But since the plaintiff agrees that the federal and state law claims are identical, it does not matter.

[11] I granted summary judgment to the defendant on Count X, alleging negligent infliction of emotional distress.  At the time, I noted possible uncertainty in Maine Law as to whether a duty arises under these circumstances, and stated that if the dispute remained relevant after trial I *(continued on next page)*

**C.     *Sexual Harassment (Counts I, II, IV, V)***

**(1)     *Liability***

Adams, Gavrilovic's supervisor, did sexually harass Gavrilovic during December 2002.  Worldwide, but not Gavrilovic, knew that Adams had engaged in similar conduct previously.  When the linguist sexually harassed Gavrilovic in connection with her interview for her earlier engagement as a linguist in Kosovo, Gavrilovic's report of the harassment to Remmey resulted in the linguist's immediate termination.  Gavrilovic admits that she could have contacted Remmey about Adams's harassment, but did not do so until May, 2003.

I conclude that under applicable Supreme Court caselaw Worldwide is liable for Adams's severe and pervasive offensive behavior.  "As a general rule, an employer is vicariously liable for an actionable hostile work environment created by a supervisor."  Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 20 (1st Cir. 2002) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)).  There is an affirmative defense to this creation of a hostile work environment.  To succeed, the employer must prove by a preponderance of the evidence: "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."  Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765.  Worldwide has failed to meet

---

might certify the issue to the Maine Law Court.  See Order Adopting Report & Recommended Decision (Docket Item 57).  The parties have not requested such certification, and did not press the claim during closing arguments.
*(continued on next page)*

its burden to prove by a preponderance of the evidence that it exercised reasonable care to *prevent* sexual harassment. Specifically, Worldwide offered no evidence of any sexual harassment policies for its overseas employees. Costa referred vaguely to military regulations as governing what happened on the bases, but Worldwide gave no specifics as to how such regulations would prevent what happened to Gavrilovic. Worldwide has shown no preventive action, including no evidence of steps taken to ensure that Adams would not repeat his earlier offensive behavior. Worldwide provided no training on sexual harassment to its overseas people, nor did it provide them with personnel policies or a handbook (although it did do so for its employees at its home office in Rumford). All Worldwide has shown is limited corrective action *after the fact* (discipline of Adams and the other linguist). Worldwide fails the first element of the affirmative defense requirement.

As a result, I need not decide whether Gavrilovic failed to take advantage of "preventative or corrective opportunities provided by the employer" (the second Faragher/Ellerth element).[12]

The Supreme Court has imposed the Faragher/Ellerth requirements upon a

---

[12] Gavrilovic gave two reasons for not contacting Remmey earlier to report Adams's December harassment: (1) a lack of privacy to do so; and (2) Gavrilovic's initial expectation that Remmey and Costa would come to Bagram in January, coupled with her preference to convey the information to Remmey personally rather than over the phone. Gavrilovic traveled extensively during the entire month of December, 2002, when the harassment was occurring. This was also her first month at the job, her harasser was her supervisor and thus effectively controlled her knowledge of and means of communication with Worldwide's home office, and there was no evidence of the ease with which traveling Worldwide employees could contact the home office. Later she could certainly have contacted the home office. There was satellite phone service available to Gavrilovic, and it could be accessed in a private location. Gavrilovic could also use email to communicate. The offensive conduct ended at the beginning of January, 2003, but Gavrilovic delayed reporting it until May 6, *(continued on next page)*

company like Worldwide that wishes to assert an affirmative defense against liability for what its supervisors do.  Otherwise, a company is liable for the acts of its supervisors.  Worldwide is liable here.

### (2)   Damages

Adams harassed Gavrilovic for almost a month.  She was working in an unfamiliar foreign location, often in a military environment, and surrounded by no friends, family or other supervisory personnel to whom she could turn.  To her credit, she resisted Adams and eventually he stopped (partly also as a result of his turn of attention to his future wife).  There was no ongoing harassment after January 1, 2003, and no longterm effects of the harassment.  Gavrilovic continued her work well after the harassment stopped, and suffered no loss of wages nor any expenses on account of the harassment.  Worldwide was unaware of the harassment, but previously had taken no preventive measures for its overseas locations, and had prior notice of Adams's own character in this regard, yet it took no steps to avoid a recurrence of his earlier misconduct.  I conclude that a compensatory damages award of $25,000 is appropriate, with no punitive damages.  I note that it is undisputed that the statutory cap is $50,000.[13]

## D.   Retaliation (Count III)

Gavrilovic claims that Worldwide's decision to order her back to the United States, revoke her security clearance, and offer her a substitute contract in Iraq

---

2003.  On the other hand, by then it was too late to correct the harassment; it had already ended.
[13] I have previously ruled that state and federal damages caps cannot be stacked.  See Johnson v. Spencer Press of Maine, Inc., No. 02-CV-00073 (D. Me. May 7, 2003) (Docket Item 113) (Judgment), aff'd, 364 F.3d 368, 377-78 (1st Cir. 2004).

was adverse retaliation for her complaints about Adams's sexual harassment and/or her complaint to Afzal about his sexually offensive characterization of her. The day after the evidence closed in this case, the Supreme Court decided a case that deals directly with what is adverse retaliation under 42 U.S.C. § 2000e-3(a). See Burlington Northern & Santa Fe R.R. Co. v. White, 548 U.S. ___, 126 S. Ct. 2405 (2006). As a result of that decision, to succeed on her claim of retaliation, Gavrilovic must show that Worldwide took "actions that would have been materially adverse to a reasonable employee or job applicant," i.e., "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 2409. I conclude that Gavrilovic satisfies this adverse action requirement.

Here, Worldwide ordered Gavrilovic back to the United States within 24 hours of her two "complaints." As a result, she had to pack immediately, ship all her belongings, and then leave her post. In addition, her security clearance was revoked.[14] It is true that Worldwide offered Gavrilovic reassignment to a different location at the same pay. (The evidence does not disclose the comparative circumstances between Afghanistan and Iraq, such as safety, physical amenities, etc.) It is also true that her security clearance was easily restorable on a new posting (although a clearance was not required for the Iraq posting). Nevertheless, the immediate extraction coupled with the initial uncertainty of what would follow

---

[14] Gavrilovic learned that her security clearance had been revoked sometime later, when Remmey told her. However, the revocation of her security analysis still remains relevant to my analysis, despite her lack of immediate knowledge. I conclude that it is an action that is materially adverse to an employee, and that it could potentially dissuade other Worldwide employees (both in the home office and overseas) from reporting similar conduct in the future. See id.
*(continued on next page)*

certainly satisfies the "adverse" standard of <u>Burlington Northern</u>. This disruption "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Id</u>. at 2415 (citations omitted). These are hardly the "trivial" harms that <u>Burlington Northern</u> distinguished. <u>See, e.g.</u>, <u>id</u>. at 2415-16.

The remaining question, then, is why Worldwide took these adverse actions against Gavrilovic. If it did so because Gavrilovic engaged in protected activity such as complaining about sexual harassment with respect to either Adams or Afzal, Worldwide would be liable under both federal and state retaliation protection. <u>See</u> <u>Pomales v. Celulares Telefónica, Inc.</u>, 447 F.3d 79, 84 (1st Cir. 2006) (complaining to management about an inappropriate comment and gesture is protected activity).

I find that Worldwide did not extract Gavrilovic from Afghanistan for complaining about Kevin Adams. There is no evidence that this was the reason, and no reason to infer that it was the reason. It is even questionable that Remmey told Costa about Gavrilovic's complaint against Adams before she was ordered back; certainly Afzal did not know. When previously there had been a complaint about Adams, Costa pulled Adams—the harasser, not the harassee— from the theater.

At trial, several possibilities emerged for the motivations behind Worldwide's adverse action. In closing argument, however, Worldwide said that there were only two motivating factors for bringing Gavrilovic back to the United States: Gavrilovic had turned out to be a difficult employee in Bagram whom Worldwide

was already planning to remove from that assignment; and/or Worldwide needed Gavrilovic in Rumford to help the company investigate how its server security had been compromised.[15]

Prior to Burlington Northern, the First Circuit established that the "mixed motive" provisions of section 107(b) of the Civil Rights Act of 1991—providing that discrimination is established when any prohibited factor contributed to an employment practice, even though other factors also motivated the practice—do not apply to claims of retaliation under Title VII, Tanca v. Nordberg, 98 F.3d 680, 684 (1st Cir. 1996).  Instead, the "Price Waterhouse rule [applies] to mixed motive retaliation claims." Id. at 685 (referencing Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)).[16]  Under Price Waterhouse, Worldwide can avoid liability even if it had an illegitimate motive such as retaliation, so long as it can prove that it would have taken the same adverse action against Gavrilovic even if it did not take the illegal factor into account.  Tanca, 98 F.3d at 685 (citing Price Waterhouse, 490 U.S. at 244).

Gavrilovic argued in closing that Burlington Northern should lead to a change in the First Circuit's analysis.  She pointed to language in Burlington Northern stating that "Title VII's substantive provision and its anti-retaliation provision are not coterminous" because "[i]nterpreting the anti-retaliation

---

[15] Worldwide conceded at closing argument that Gavrilovic's refusal to inform Afzal who had provided her with the email to which she was not a party was not a motivating factor for her removal from Afghanistan.

[16] The First Circuit explained that because "Congress' intent remains unclear regarding the application of the 1991 Act to Title VII mixed motive retaliation claims," the plain language of the statute controls, id. at 684, and "the relevant provisions of the Civil Rights Act make no mention of retaliation claims," id. at 682-83.

provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of the Act's primary objective depends." Burlington Northern, 126 S. Ct. at 2414.  But I must follow the First Circuit's analysis in Tanca unless and until that court overrules Tanca.

Accordingly, even if retaliation was *a* factor, I find that Worldwide would have pulled Gavrilovic from Afghanistan regardless.  Worldwide was intending to pull Gavrilovic from Afghanistan prior to the escalation of events in May, 2003. Costa testified that he had decided to pull her even before he knew she had seen the offensive email.  It is true that the pay raise in April while Gavrilovic was in the hospital in Germany recognized her good performance while sole manager at Bagram.   On the other hand, Costa was receiving complaints regarding Gavrilovic's inability to get along with other translators as well as anti-Muslim bias.  Most important, the very email containing the offensive epithet backs up Costa's testimony.   It discusses in detail the imminent hiring of Gavrilovic's replacement.  Therefore, despite the pay raise in April, the evidence demonstrates that Worldwide intended to replace Gavrilovic in her role at Bragram before she complained about either Adams or Afzal.

The precise timing of Gavrilovic's extraction from Afghanistan may well have been motivated by the server security issue and/or by an improper purpose. Costa knew by April 13, 2003 that Afzal had used the offensive term.   It is reasonable to infer that after Gavrilovic confronted Afzal about the offensive email, Afzal then contacted his superiors in Rumford and obtained authority to send Gavrilovic and Remmey back to the United States (see Williamson's statement to

Gavrilovic on the phone to "have a nice ride home").  I conclude that senior management knew that Gavrilovic had seen the email and had complained about the offensive epithet when they ordered her back to the United States.  Costa's desire to "defuse" the situation between Afzal and Gavrilovic in part involved this incident.

But although Gavrilovic's confrontation with Afzal may have been one of the factors precipitating Gavrilovic's immediate withdrawal from Afghanistan, Worldwide had been planning to remove Gavrilovic from Afghanistan earlier and would have done so anyway.  The evidence shows that Williamson believed that Afzal had especially valuable information or contacts that could "turn out to be our Golden Goose."  Thus, it appears that when confronted with two employees accusing each other of misconduct or poor performance, Worldwide chose the one with the most to offer in terms of contacts and experience.  I conclude that Worldwide has proven that it would have removed Gavrilovic from Afghanistan regardless of her discrimination complaints.

I conclude also that Worldwide's later actions with respect to Gavrilovic (denying her a new assignment unless she explained how she obtained the emails) were motivated by Costa's legitimate concern to determine how the emails became available to her.  As an employee, indeed a management employee albeit at a low level, Gavrilovic was obliged to assist Worldwide in its investigation of how Remmey came into possession of Company email.

Therefore, Gavrilovic cannot recover on her federal and state retaliation claims.

E.      *Defamation (Counts VI, VII, VIII)*

   *(1) Elements of Defamation*

   Under Maine law, the elements of defamation are:

> (1)    a false and defamatory statement concerning another;
>
> (2)    an unprivileged publication to a third party;
>
> (3)    fault amounting at least to negligence on the part of the publisher;
>
> (4)    either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1996) (citing Restatement (Second) of Torts § 558 (1977)) (additional citation omitted).  I consider each element in turn.

   ***The statement here was false and defamatory***.   I have found that Gavrilovic's supervisor, Afzal, wrote an email in which he referred to her as "The Bagram Fuck toy."  The statement was false.  The evidence at trial was that Gavrilovic had a single monogamous relationship while she was at Bagram.

   The statement also was defamatory.  The reasonable interpretation of the statement is that Gavrilovic had no value as an employee to the Company except as a sexual plaything.  Cf. Ballard v. Wagner, 877 A.2d 1083, 1088 (Me. 2005) ("[I]n assessing whether words are defamatory, they must be 'taken in their ordinary and usual meaning.'") (citation omitted); Rippett, 672 A.2d at 86 ("A statement is defamatory 'if it tends so to harm the reputation of another as to lower [her] in the estimation of the community or to deter third persons from associating or dealing with [her].'") (citation omitted).  It is true that the statement is a statement of opinion, but under Maine law a statement of opinion still can be

defamatory if it implies facts that are provable or disprovable. <u>Ballard</u>, 877 A.2d at 1088 ("A statement of opinion may be actionable if it implies the existence of undisclosed defamatory facts.") (citation omitted).[17]   The statement here is disprovable and was disproved at trial.

   ***The statement was published***.  The statement was published first when Afzal sent the email containing it to Ellingwood.   It was published second when Ellingwood reported it orally to Costa, the Company president.   It was published third when Remmey emailed it in the compendium to Costa.   Under Maine law, publication within a company is still publication.  <u>Staples v. Bangor Hydro-Elec. Co.</u>, 629 A.2d 601, 603-04 (Me. 1993) ("We have held that '[a]lthough [a] communication to [fellow employees] may have been protected by a qualified privilege, it was nevertheless a publication of the information.") (alterations in original) (citation omitted).[18]   This remains true even if the defamation action is brought against the company itself rather than against the individual employee. <u>Id</u>. (citing Restatement (Second) of Torts § 577 cmt. i ("The communication within the scope of his employment by one agent to another agent of the same principal

---

[17] <u>See</u> <u>also</u> <u>Lester v. Powers</u>, 596 A.2d 65, 71 & n.9 (Me. 1991) ("Although Maine's common law of defamation does not allow recovery for statements of opinion alone, deciding whether a statement expresses 'fact' or 'opinion' is not always an easy task.  Our standard [the <u>Caron</u> test] looks to the totality of the circumstances. . . . The <u>Caron</u> standard comports with the decisions of other jurisdictions [including the United States Supreme Court].") (citing <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1, 18-20 (1990) (statements are protected as opinion unless "provably false"); <u>Caron v. Bangor Publ'g Co.</u>, 470 A.2d 782, 784 (Me. 1984)) (additional citations omitted); <u>Levinsky's, Inc. v. Wal-Mart Stores, Inc.</u>, 127 F.3d 122, 127 (1st Cir. 1997) ("A statement couched as an opinion that presents or implies the existence of facts which are capable of being proven true or false can be actionable.") (applying the Supreme Court's <u>Milkovich</u> standard to a Maine defamation action).

[18] Prosser and Keeton assert that jurisdictions that have come to the opposite conclusion—holding that intracompany publication does not constitute publication to a third party—appear to have done so "as a result of confusing publication with privilege."  W. Page Keeton et al., <u>Prosser and Keeton on the Law of Torts</u> § 113 at 798 n.15 (5th ed. 1984).

is a publication not only by the first agent but also by the principal and this is true whether the principal is an individual, a partnership or a corporation.")) (additional citations omitted). I will address later whether the published statement was privileged.

**_There was at least negligence_**. By sending the email containing the epithet, Afzal certainly had fault amounting at least to negligence. See <u>Levinsky's, Inc. v. Wal-Mart Stores, Inc.</u>, 127 F.3d 122, 128 (1st Cir. 1997) (concluding that fault is "a predicate to recovery" under Maine defamation law). Under agency principles, that fault is imputed to his employer, Worldwide. <u>See</u>, <u>e.g.</u>, <u>Legassie</u>, 741 A.2d at 444 ("Generally, an employer may be vicariously liable for the negligence of its employees….").

**_Special harm is not required_**. The statement—which simultaneously imputes "serious sexual misconduct" to the plaintiff and disparages her occupational abilities—is actionable _per se_ even if no special harm results. <u>See</u> Restatement (Second) Torts § 570 (liability without proof of special harm for slander that imputes to another a "matter incompatible with [her] business, trade, profession, or office" or "serious sexual misconduct").[19]  "Recovery for slander _per se_ requires no showing of special harm beyond the publication itself." <u>Rippett</u>, 672 A.2d at 86.

### (2) Privilege

Maine has recognized a conditional privilege for statements within an

---

[19] <u>See</u> <u>also</u> <u>Marston v. Newavom</u>, 629 A.2d 587, 593 (Me. 1993) (approving an instruction to the jury that a statement is "slanderous per se if it 'had a direct tendency to injure the plaintiff in her occupation or profession'").
_(continued on next page)_

employment relationship, such as reviewing another employee's qualifications (as Afzal purports to be doing in his e-mail), see Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me. 1989), and related contexts, see Lester v. Powers, 596 A.2d 65, 70 (Me. 1991) (recognizing conditional privilege for alumna input on college tenure decisions). Then, liability exists "only if the person who made the defamatory statements loses the privilege through abusing it." Lester, 596 A.2d at 69. Abuse occurs "when the person either knows the statement to be false or recklessly disregards its truth or falsity," id., "or acts with spite or ill will." Cole v. Chandler, 752 A.2d 1189, 1194 (Me. 2000) (quoting Rippett, 672 A.2d at 87). Making privileged statements with "malicious intent" also constitutes abuse. McCullough v. Visiting Nurse Serv. of S. Me., Inc., 691 A.2d 1201, 1204 (Me. 1997). In making the defamatory statement, Afzal meets all those standards. Cf. Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 9.3.5.2 at 9-50 ("The use of excessive, vituperative language in defamatory statements may raise an inference of abuse and consequent loss of privilege."). Under agency principles, his abuse of the privilege is imputed to his employer, Worldwide. See Staples, 629 A.2d at 604 (upholding a jury verdict against a company for the defamatory statements of its employee where the evidence supported a finding of abuse of qualified privilege by the employee).

On the other hand, the re-publications within the Company, to pursue discipline of Afzal and for other related purposes, are privileged.

### (3)    *Liability*

It is easy to conclude that Afzal should be liable to Gavrilovic for defamation. But Gavrilovic did not sue Afzal; she sued Worldwide. It is more difficult to conclude that Worldwide should be liable. As soon as Afzal made the statement, Worldwide repudiated it. Ellingwood immediately notified Costa. Costa demanded immediate discipline of Afzal, including the possibility of terminating him. The offensive comment was not circulated until Remmey somehow invaded Afzal's e-mail. This is almost strict liability for the corporation. But liability follows from Maine law principles.

Hence I conclude that Worldwide has liability for defamation.

### (4) *Defamation Damages*

In Maine, "a plaintiff need not prove special damages to recover general damages for slander when the falsely spoken words impugn his profession, occupation or official status." Gautschi, 565 A.2d at 1011. "To support a claim for punitive damages," Maine "require[s] proof of ill will toward the plaintiff or outrageous conduct by the defendant by the clear and convincing standard." Staples, 629 A.2d at 604.

Although under the doctrine of *respondeat superior* an "employer may be liable for punitive damages whenever its employee commits a 'malicious tort,' such as libel or slander, within the scope of his or her employment," Sack on Defamation, supra, § 10.3.5.4 at 10-32, I conclude that in light of the proper mitigating steps taken by Worldwide—particularly the immediate disciplinary action against Afzal and the suppression of the email until another employee,

Remmey, unearthed it improperly—punitive damages are not appropriate in this case.  Cf. id. § 10.5.5 at 10-51 ("Anything that would tend to show increased or decreased injury to the plaintiff, including, for example, correction or retraction, ought to be, and usually is, admissible in mitigation . . . of damages. . . .").

As for general and special damages, the defamation here was highly offensive.  But because the only actionable defamation was the internal publication by Afzal to Ellingwood, because the company took immediate steps to discipline Afzal and because it suppressed the email from further distribution until Remmy improperly invaded the server, I conclude that the Company (as contrasted with Afzal) should pay only modest damages for defamation, namely $1,000.

### F.    Breach of Contract (Count XIII)

Gavrilovic's lawyer clarified at closing argument that Gavrilovic's only breach of contract claim is for unpaid medical expenses.  He also conceded that the written contract has no application to the medical expenses breach of contract claim.[20]

Rather, Gavrilovic's argument is that Worldwide made an enforceable oral commitment to cover her medical expenses.  Gavrilovic testified that when she

---

[20] Even without this concession, I would have concluded that the written contract, Joint Exhibit 5, cannot be taken literally.  It says that it involves the Serbian language, but Gavrilovic was being assigned to Afghanistan.  It states that she will "provide translation and interpretation services for [Serbian Languages] in and around [Afghanistan]."  Worldwide did not engage Gavrilovic to provide Serbian interpreting services in Afghanistan, but to be a site manager of linguists speaking Farsi, Pashtun, and Dari.  It says that Worldwide's principal place of business is Andover, Maine, but when the contract was written the company was operating out of Rumford, Maine, not Andover.  It calls her an independent subcontractor, and I have already ruled that she was an employee.  It sets a rate of pay, but that rate of pay was increased during her contract without any amendment to the written agreement.
*(continued on next page)*

was diagnosed with her gallstone condition in March of 2003, she inquired whether the company would pay for her medical expenses and the president of Worldwide, Costa, orally promised to pay for the surgery and related incidental expenses.  After Costa agreed, she had the medical procedure, and Worldwide paid for much of it.  After the escalation of events in May ultimately led to Gavrilovic's cessation of employment with Worldwide, the company stopped paying for her medical expenses.

An oral contract is enforceable if there is either reliance or consideration.  I find that Gavrilovic's continuation of employment with Worldwide after the promise was made is sufficient consideration under Maine law to enforce the promise to pay for her expenses.  See Gould v. Johnson, 166 A.2d 481, 483 (Me. 1960) (accepting the "principle that continued service and employment are consideration for an interest which the employee thus acquires…").

I therefore conclude that Costa's oral commitment to pay for Gavrilovic's expenses is enforceable.  Worldwide contested none of these expenses before Gavrilovic left the company, except for phone charges.  I therefore award Gavrilovic $1,098.80 for the unpaid Landstuhl Hospital expenses, $290 for the unpaid lodging charges while she recuperated at Fisher House, the $840 food allowance and $385.60 for the expenses incidental to her medical procedure and recovery.  I do not award her the $390 in phone charges she incurred; she disclaimed this amount while she was actively seeking reimbursement from Worldwide.  The total contractual damages award is $2,614.40.

### III.  CONCLUSION

I award a total recovery of $28,614.40, as follows:

1.      $1,000 for damages on Counts VI, VII, and VIII, the defamation claims;

2.      $2,614.40 for expenses on Count XIII, the breach of contract claim; and

3.      $25,000 for damages on Counts I, II, IV, and V, the federal and state sexual harassment claims.

No damages are awarded on Count III, the federal retaliation claim.

The plaintiff is also entitled to her reasonable attorney fees on the sexual harassment claim.

**SO ORDERED.**

**DATED THIS 25TH DAY OF JULY, 2006**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

**U.S. DISTRICT COURT**
**DISTRICT OF MAINE (PORTLAND)**
**CIVIL DOCKET FOR CASE #: 2:05cv38 (DBH)**

| | | |
|---|---|---|
| **TANJA GAVRILOVIC** | Represented By | **Stephen P. Beale** |
| | | **Jennifer L. Thompson** |
| **Plaintiff** | | Skelton, Taintor & Abbott |
| | | P.O. Box 3200 |
| | | Auburn, ME 04212-3200 |
| | | (207) 784-3200 |
| | | email: sbeale@3200.com |
| | | jthompson@3200.com |

**v.**

| | | |
|---|---|---|
| **Worldwide Language Resources Incorporated** | Represented By | **Christoper T. Vrountas** |
| | | **Jeffrey A. Meyers** |
| **Defendant** | | Nelson, Kinder, Mosseau |
| | | & Saturley, P.C. |
| | | 99 Middle Street |
| | | Manchester, NH 03101 |
| | | (603) 647-1800 |
| | | email: cvrountas@nkms.com |
| | | email: jmeyers@nkms.com |